The summary judgment is reversed. The case is remanded.

**BROWN–MARX ASSOCIATES, LTD.;**
and Gary E. Smith,
Plaintiffs-Appellants,

v.

**EMIGRANT SAVINGS BANK;** and
Prudential Savings Bank,
Defendants-Appellees.

No. 82–7023.

United States Court of Appeals,
Eleventh Circuit.

May 2, 1983.

See also, 527 F.Supp. 277.

Ollie L. Blan, Jr., Spain, Gillon, Riley, Tate & Etheredge, Birmingham, Ala., for plaintiffs-appellants.

James L. North, North, Haskell, Slaughter, Young & Lewis, Guy Martin, Birmingham, Ala., for defendants-appellees.

Before GODBOLD, Chief Judge, FAY and SMITH *, Circuit Judges.

GODBOLD, Chief Judge:

This diversity case concerns a dispute between a prospective borrower and a bank over a $1.1 million loan commitment for financing an office building. Emigrant Savings Bank refused to lend the money, maintaining among other things that Brown-Marx Associates, the would-be borrower, had failed to satisfy the minimum rental requirement of the commitment. Brown-Marx sued the bank alleging breach of contract and various tort theories of recovery. The matter was tried to a jury which found for Brown-Marx on its contract claim. The district court granted the bank's motion for new trial, primarily on the ground it had erroneously instructed the jury on the applicable law. Later the court granted summary judgment for the bank on all claims. We affirm.

I. *Background*

a. The initial dealings

Brown-Marx is an Alabama limited partnership with Gary Smith its sole general partner. Smith formed the partnership to purchase and renovate an office building in Birmingham. In May 1978 Brown-Marx obtained a loan commitment for permanent financing of the building from Emigrant Savings Bank [1] of New York. Brown-Marx paid the bank $22,000 for the commitment, which was to expire May 1, 1979. Later

---

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. The commitment was made with Prudential Savings Bank, also of New York. Later Prudential merged with Emigrant. For simplicity, we refer only to Emigrant, the successor bank.

Brown-Marx paid the bank $11,000 to extend the commitment to November 1, 1979.

Under the commitment the bank agreed to lend Brown-Marx $1.1 million, the "ceiling loan," if Brown-Marx provided satisfactory documentation of renovations, signed leases providing for at least $714,447 annual rentals, and a satisfactory appraisal that the building was worth at least $2.4 million. The commitment provided in the alternative for a "floor loan" of $750,000 if the major requirements for the ceiling loan were not met. The provisions for the alternative loans, floor or ceiling, are at the heart of the dispute:

> The Bank has agreed to lend the sum of $1,100,000 secured by a permanent mortgage on the . . . [building].
>
> \* \* \* \* \* \*
>
> 2. Loan to close upon the following conditions being satisfactorily complied with:
> a. Exhibition of all required government certificates, permits, licenses, etc.
> b. [Details of renovation to be done "in a workmanlike manner satisfactory to the Bank."]
> c. Exhibition of signed leases for a term of not less than one year covering not more than 140,449 net rentable square feet at a rental of not less than $714,447 per annum and the space rented is rented on a basis so that if the building were 100% rented, the annual rentroll would be at least $840,526. Said rentals to be on an unfurnished basis without any concessions or offsets thereto. Leases to be approved by the Bank and assigned to the Bank.
>
> \* \* \* \* \* \*
>
> It is also understood and agreed that in the event that condition 2.a. is met, but conditions 2.b. and c. are not, the loan shall be in the amount of $750,000 . . . .

The loan, whether ceiling or floor amount, was to be secured by a first mortgage on the building.

On the strength of this commitment Brown-Marx obtained from two Alabama banks $1.1 million interim financing to purchase and renovate the building, to be repaid from the proceeds of the permanent loan from Emigrant. Brown-Marx bought the building, renovated it, and proceeded to lease space in it.

### b. The pre-closing activities

In September 1979, about six weeks before the commitment was to expire, Smith wrote the bank that he wanted to close the loan for the ceiling amount in mid-November; he desired the extension because he planned to be out of the country in October. The bank responded that the loan must close by November 1. Smith hired Norman King to compile information and documents needed to close the loan and submit them to the bank. He made tentative arrangements with an appraiser to appraise the building and submitted his credentials to the bank for approval. On October 5 Smith sent the bank a letter saying Brown-Marx intended to meet the November 1 closing deadline. He then left the country and did not return until shortly before the scheduled closing date.

King gathered and sent to the bank the documents required to close the ceiling loan, including those set out in paragraph 2 of the commitment plus appraisal, survey, title binder and certificates of occupancy. On October 18 King sent the rentroll, renovation summary, and copies of about 75 leases to Richard Mulcahy, an officer of the bank. A week later, in a phone conversation with Mulcahy, King inquired whether Mulcahy had received the documents and whether everything needed was there. Mulcahy said the leases were satisfactory, and he asked no questions about them. King inquired whether the appraiser named by Smith would be acceptable, and Mulcahy replied the bank hadn't yet approved him but that he expected no problem. King also asked if the bank had chosen its attorney for the loan closing. Mulcahy responded that the bank had not decided on the attorney. Mulcahy asked King to send him photos of the building, a description of some of the improvements, and information about possible new tenants.

The next day King talked again with Mulcahy and discussed the bank's require-

ments for the title binder and survey. King confirmed that the bank would waive its requirement for a personal financial statement on Smith's limited partner. Mulcahy told King the name of the law firm that the bank would use to close the loan. King called this firm to discuss the particulars of closing, but the firm had not scheduled it. King mailed Mulcahy the photographs he had requested. Smith returned and on October 29 phoned Mulcahy to discuss the documents that had been furnished. Mulcahy indicated that everything he had received was satisfactory. The next day Smith again talked with Mulcahy and was told the bank needed the appraisal and title binder. Mulcahy did not mention any problems with closing. King sent the title binder, zoning certificate, survey, permits and licenses to Mulcahy on October 30. The appraisal prepared by Smith's appraiser was sent to Mulcahy on October 31. Smith tried unsuccessfully to reach Mulcahy by phone on the 31st to confirm the closing and then sent a telegram saying the banks that had provided interim financing would not extend their loans and that he would be in New York on November 1 to close the loan. Smith's mortgage loan broker did reach Mulcahy on the 31st. He told Mulcahy that Smith, Smith's attorney, and the broker would be in New York the next day to close the loan. Mulcahy said there was no point in coming because the bank was not ready to close.

### c. Closing day

Nonetheless Smith, his attorney, and the loan broker went to New York on November 1 and tried to close the loan. They met Mulcahy at lunch. Mulcahy said they would have to see Barbey, senior vice president of the bank, about the closing. That afternoon they went to the bank and waited two hours for Barbey. Smith had with him a "lapful" of documents, including more leases, to give the bank. It was late afternoon when they saw Barbey. He informed them that the bank could not close the loan that day because it was too late in the day. Also the bank had not yet inspect-

ed the building. Barbey said, however, that he would extend the commitment. Smith insisted that the bank give him not only a written promise to extend the commitment but also a statement that Brown-Marx had met all conditions of the commitment and that the bank would close the loan. This the bank refused to do although it continued to offer to extend the commitment for a reasonable time to allow for closing. At the end of the meeting Brown-Marx tendered a default letter to the bank stating that it had fully complied with the commitment and was ready, willing and able to close the loan according to the terms of the commitment.

### d. The aftermath

On November 5 the bank sent a man to inspect the building and verify the renovation and leases. The inspector noticed that some space listed by Brown-Marx in the rentroll as leased was vacant and some was occupied by one of Smith's other business enterprises. On November 15 Brown-Marx sent the bank several additional leases and an addendum to another lease. On November 30 a representative of the bank called Smith to discuss the situation. He told Smith the bank considered the appraisal Brown-Marx had submitted unacceptable,[2] that there was an $85,000 shortfall in the rents required under paragraph 2.c., and that the bank planned another inspection of the building on December 3. The representative arrived December 2 and told Smith the bank was still willing to close the loan if the commitment terms were met. Smith refused the representative permission to inspect the building to verify the rentroll unless the bank would make a settlement offer. He maintained the bank was looking for an excuse not to close the loan. On December 3 another bank representative phoned Smith and reiterated that the bank was willing to make the loan in either the ceiling or floor amount if a satisfactory appraisal were submitted and the other commitment requirements were met. As for the offer to close the floor loan, Smith said the bank should have made that

2. The district court found the appraisal satisfactory.

offer on November 1. Smith maintained all requirements were met; he refused to supply another appraisal and said he was not going to negotiate for a loan any more. The bank's attorney contacted Smith's attorney with the same message and received the same reply: that Brown-Marx felt it had complied with the commitment requirements and the bank was in default. There were no more conversations between the parties. After discussions broke off, Smith's local banks declined to extend their interim loans, and the building was sold to pay them off.

### e. The litigation below

Brown-Marx sued claiming breach of contract in the bank's failure to close either the floor or ceiling loan, wrongful interference with Brown-Marx's contractual relationship with Prudential Bank,[3] and fraud.

On the eve of trial the district court granted the bank's motion for summary judgment on the wrongful interference claim. A jury trial was conducted on the remaining claims. The court directed a verdict for the bank on the fraud claim. The breach of contract claim was submitted to the jury on the theory of substantial performance, and the jury found for Brown-Marx and awarded $543,000 damages.

The court granted the bank's motion for new trial on the grounds that the case had been improperly submitted to the jury on the doctrine of substantial performance and that some of Brown-Marx's evidence on damages should have been excluded as too speculative. The court later granted summary judgment for the bank on the breach of contract claim with respect to both ceiling and floor loans and on a fourth claim that Brown-Marx had added after trial for breach of implied duty to deal in good faith. 527 F.Supp. 277.

### II. The ceiling loan: substantial vs. perfect compliance

The loan commitment imposed several conditions on the $1.1 million ceiling loan.

Among these was the requirement in paragraph 2.c. for "[e]xhibition of signed leases for a term of not less than one year covering not more than 140,449 net rentable square feet at a rental of not less than $714,447 per annum ...." The main reason the bank gave for not making the ceiling loan was that Brown-Marx did not meet the $714,447 minimum annual rental requirement.

The trial judge submitted the breach of contract claim to the jury with an instruction that plaintiffs had the burden to prove by a preponderance of the evidence "that they had substantially performed all of the ultimately agreed upon conditions precedent to the ceiling loan." The court granted a new trial, concluding that this instruction was erroneous because substantial compliance was not applicable to the minimum annual rental clause in the commitment and Brown-Marx was, therefore, required to comply fully with the minimum annual rental requirement. Later the court granted the bank's motion for summary judgment with respect to the ceiling loan, finding there was no genuine issue of material fact as to whether Brown-Marx had failed to satisfy the minimum annual rental requirement.

There is no dispute in material facts concerning Brown-Marx's failure to comply fully with the minimum rental requirement, even when the leases brought to New York on closing day are considered. Five of the leases submitted were month-to-month leases rather than for a term of at least a year. Two leases covered space that was not in the building. Another had never been executed, and the supposed tenant had neither paid rent nor occupied the space. The rental amount on one lease was overstated. There was a shortfall in the dollar amount of annual rental. While there was considerable dispute about the size of the deficiency,[4] Brown-Marx does not contend

---

**3.** Emigrant's predecessor. See n. 1 supra.

**4.** Brown-Marx, conceding that some leases were properly excludable from the tally, main-

tained below that annual rentals were $713,526. The bank calculated them as $700,826; the district court concluded that at most they were $706,176.

that annual rentals were as much as $714,-447, but rather that substantial compliance with the minimum rental provision was adequate. There is a paucity of Alabama case law on this subject.[5] Alabama has applied the substantial performance doctrine in only one situation outside the field of construction contracts and then on facts that it found were analogous to a building contract situation. *See* discussion of *Bruner v. Hines,* 295 Ala. 111, 324 So.2d 265 (Ala. 1975), below. We conclude that the Alabama courts would hold that substantial performance does not apply to the minimum required rental provision of the loan commitment.

Courts have usually treated the terms and conditions of a loan commitment as conditions precedent to the lender's obligation to perform. *See e.g., Chambers & Co. v. Equitable Life Assurance Society,* 224 F.2d 338 (5th Cir.1955); *First Federal Savings & Loan Association v. Mortgage Corp. of the South,* 467 F.Supp. 943 (N.D.Ala. 1979); *Johnson v. American National Insurance Co.,* 126 Ariz. 219, 613 P.2d 1275 (Ariz. App.1980); *Frank's Nursery Sales, Inc. v. American National Insurance Co.,* 388 F.Supp. 76 (E.D.Mich.1974); *North Denver Bank v. Bell,* 528 P.2d 413 (Colo.App.1974); *Boston Road Shopping Center, Inc. v. Teachers Insurance and Annuity Association,* 13 A.D.2d 106, 213 N.Y.S.2d 522 (N.Y. App.Div.1961), *aff'd,* 11 N.Y.2d 831, 227 N.Y.S.2d 444, 182 N.E.2d 116 (N.Y.1962). The loan commitment fee is paid for the privilege of later borrowing the money if the conditions are met. *Chambers & Co., supra.* The language of the loan commitment here expressly provides that compliance with the minimum annual rentals provisions is a "condition" to receiving the loan. Concerning such an express condition, 5 *Williston on Contracts* (Third Edition), Section 675, states:

As a general rule, conditions which are either expressed or implied in fact must be exactly fulfilled or no liability can arise on the promise which such conditions qualify.

*Id.* at 184.

■ The substantial performance doctrine provides that where a contract is made for an agreed exchange of two performances, one of which is to be rendered first, substantial performance rather than exact, strict or literal performance by the first party of the terms of the contract is adequate to entitle the party to recover on it. The intent of the doctrine is equitable: to prevent unjust enrichment or the inequity of one party's getting the benefit of performance, albeit not strictly in accord with the contract's terms, with no obligation in return. The courts will allow recovery under the contract, less allowance for deviations, where a party in good faith has substantially performed its obligation. *See generally,* 3A *Corbin on Contracts,* Sections 700–701; 6 *Williston on Contracts* (Third Edition), Section 842. The doctrine is widely applied to building contracts, though not always limited to them.

■ The doctrine is not primarily concerned with substantial performance of a "condition" but rather with substantial performance by one party of his obligations arising out of the agreed exchange under the contract. Its object is to prevent forfeiture of work, labor and materials supplied by the substantially performing party. Its application is illustrated in terms of construction contracts in 3A *Corbin on Contracts,* Section 701:

[I]t is not with express conditions or interpretation that we are now primarily concerned. We are now dealing with a

---

**5.** In this diversity case we look to state law to determine substantive elements of the claim and to federal law for the test of sufficiency of the evidence. *See Vandercook & Son, Inc. v. Thorpe,* 395 F.2d 104 (5th Cir.1968); *see also Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321 (11th Cir.1982). The loan commitment was entered into in Alabama, it concerned real property situated there, and the principal place of performance was in Alabama. Thus Alabama law governs both questions of performance and torts growing out of the contract. *See Ideal Structures Corp. v. Levine Huntsville Development Corp.,* 396 F.2d 917 (5th Cir. 1968); *J.R. Watkins Co. v. Hill,* 214 Ala. 507, 108 So. 244 (Ala.1926); *Deavors v. Southern Express Co.,* 200 Ala. 372, 76 So. 288 (Ala. 1917).

contract that consists of two exchanged promises requiring the rendition of two promised performances, without making either promise expressly conditional on anything. The builder promises to build and the owner promises to pay.

\* \* \* \* \* \*

It is substantial performance of what the builder promised to do, of the construction work, of the equivalent for which the owner has promised to pay, that is the "condition" of the owner's duty to pay. It is not substantial performance of "a condition" that must be rendered; "substantial performance" *is* the condition—the fact that must exist before payment is due.

*Id.* at 314.

■ Under the Restatement of Contracts the loan commitment would be termed an "option contract" with Brown-Marx's performance being "acceptance" of the offer to lend money. Despite equity's dislike of forfeiture, the requirements of an option contract governing the manner of acceptance are strictly applied. *See 1 Restatement Second of Contracts* Section 26 and comment d.

■ Cases from other jurisdictions involving loan commitments support our conclusion that substantial performance has no application to the minimum annual rental requirement here. *See Johnson v. American National Insurance Co.,* 126 Ariz. 219, 613 P.2d 1275 (Ariz.App.1980) (loan commitment is essentially an option contract, strict compliance required, substantial compliance insufficient); *accord Civic Plaza National Bank v. First National Bank,* 401 F.2d 193 (8th Cir.1968); *North Denver Bank v. Bell,* 528 P.2d 413 (Colo.App.1974). Brown-Marx's authorities are not convincing. It relies heavily on *Bridgkort Racquet Club, Inc. v. University Bank,* 85 Wis.2d 706, 271 N.W.2d 165 (Wis.App.1978), which involved a loan commitment conditioned on execution of personal guarantees by seven guarantors, a title policy showing good title, and satisfactory insurance. The lender appears not to have objected to application of the doctrine at trial or on appeal. Only five of the seven guarantors had signed pledges as of the scheduled closing date; the other two signed within a week. The court stated that this would not have been substantial performance because the bank was entitled to have its full security; but because the bank did not attend the closing where it could have expressed its dissatisfaction and the defect could have been cured, the partial performance was upheld. The title policy and the insurance policy also did not comply with the bank's requirements, but again the bank's failure to attend the closing was held to make less than complete performance sufficient. So although *Bridgkort* purports to apply the doctrine of substantial performance to the conditions it does so with a gloss of waiver, that is, saying with respect to each requirement that the bank could have insisted upon perfect performance if it had attended the closing. In the present case the bank was present on the closing date and did nothing tending to waive the minimum rental requirement. The closing aborted for reasons attributable to both parties, but this was not a waiver. Indeed the bank agreed to extend the commitment, but Smith refused unless the bank would agree that Brown-Marx had fully performed when in fact it had not.

In *St. Paul at Chase Corp. v. Manufacturers Life Insurance Co.,* 262 Md. 192, 278 A.2d 12 (Md.), *cert. denied,* 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971), the loan commitment called for a certification that the construction of the building had been "satisfactorily completed." The lender had testified that he did not interpret "satisfactory" completion to require 100% completion. The court concluded that since a question of degree was involved substantial compliance was intended by the lender and this required application of substantial performance. *Selective Builders, Inc. v. Hudson City Savings Bank,* 137 N.J.Super. 500, 349 A.2d 564 (N.J.Super.Ct.Ch.Div.1975), held that 100% completion of a building was neither required nor implied by the commitment. *First National State Bank v. Commonwealth Federal Savings & Loan Associ-*

*ation,* 610 F.2d 164 (3d Cir.1979), applied substantial performance to a construction condition, but the commitment contained no explicit requirement for complete performance and no specific rental achievement clause.

*Bruner v. Hines,* 295 Ala. 111, 324 So.2d 265 (Ala.1975), is the only Alabama decision we have found that has applied substantial performance outside the field of construction contracts. In *Bruner* a sales contract included a "rough plat" drawn by the buyer describing the land to be sold, in which the road frontage of land was estimated at 366 feet based on a steel tape measurement, and the land was to contain 15 acres. The final survey showed 15.1 acres with 376.5 feet of road frontage. The buyer offered the seller $500 extra for the additional 0.1 acre, but the seller refused to convey, maintaining that the buyer's survey did not comply with the contract. The buyer sued claiming substantial performance. The Alabama Supreme Court held substantial performance applicable. The court reasoned that using a steel tape rather than survey equipment as the basis of the road frontage showed that the plat's acreage was only an estimate and that the seller's promise to convey should not be strictly conditioned on the buyer's furnishing a survey identical to the rough plat. The court emphasized the practical difficulty of surveying land to a numerically exact degree. It noted an analogy between building contracts and the facts before it. The court applied substantial performance but intimated that its application was limited:

> Because both the individual and societal interests are vital coordinates in a private enterprise system, the compromise of full performance should be kept minimal, and compensation should be paid whenever a party's bargained for exchange is not fulfilled.

*Id.* at 270.

■ Here the requirement for minimum annual rentals is expressed in paragraph 2.c. of the contract in a definite and precise manner. The contingency of less than perfect performance is specifically dealt with in the provision that if condition 2.a., but not conditions 2.b. and 2.c., is met, then the loan is to be made in the floor amount. In the face of these explicit contractual expressions there is no leeway for substantial performance without frustrating the intent of the parties. Nor is the requirement here inequitable. The minimum rental requirement is a matter of vital interest to the bank because it provides a major part of the loan's security. And, unlike *Bruner,* the requirement not met is possible to achieve as a practical matter.

■ Brown-Marx maintains that even if strict compliance would ordinarily be required, the bank waived it and is estopped from asserting it. It relies upon Mulcahy's statements to King in late October to the effect that documents submitted were "satisfactory" and that everything was "in order" and "in order for now." Under Alabama law, waiver requires the intentional relinquishment of a known right. *City of Montgomery v. Weldon,* 280 Ala. 463, 195 So.2d 110 (Ala.1967); *State Farm Mutual Automobile Insurance Co. v. Hubbard,* 272 Ala. 181, 129 So.2d 669 (Ala. 1961). One must show that the person charged with waiver had at the time knowledge, actual or constructive, of the existence of his rights or all the material facts upon which they depended. *Id.*

Brown-Marx did not produce evidence that the bank knew all material facts. The bank could not have known from the face of the rentroll of its defects. A painstaking examination of the leases themselves would have revealed some defects, but it would not have revealed all—for example, lessees who had paid no rent and lessees not in occupancy. Also Mulcahy's statements themselves do not clearly speak an intent to waive. Brown-Marx's conduct in continuing to submit leases both on and after closing day refutes the requirement that the alleged waiver was relied on.

We conclude that as a matter of Alabama law the bank was entitled to require total compliance with the minimum annual rental requirement. The district court correctly granted the motion for new trial and later

the motion for summary judgment on the ceiling loan claim. We need not consider Brown-Marx's challenge to the ruling that some of its evidence of damages was too speculative.

### III. *The loan plan*

The court correctly granted summary judgment with respect to the $750,000 floor loan.

 Brown-Marx maintains that when it arrived in New York on the abortive closing day it was prepared to accept the floor loan if it could not qualify for the ceiling loan. The loan commitment provided that for Brown-Marx to receive the loan, whether in ceiling or floor amount, it was to provide the bank with a mortgage conveying a first mortgage lien. Under Alabama law, for Brown-Marx to recover for a breach it was required to show that it was able and ready to perform. *See Mobile Electric Co. v. Nelson,* 209 Ala. 554, 96 So. 713, 717 (Ala.1923). But no facts show that on November 1 Brown-Marx was either able or ready to close a loan for $750,000. There is no evidence that Brown-Marx even mentioned the floor loan alternative. Brown-Marx argues that the bank was not ready to close any loan on November 1, therefore it was not required to "offer" to close the floor loan. This misconceives the requirement of being able and ready. Before Brown-Marx can recover for alleged breach of the commitment to lend $750,000, it has to establish that it wanted to avail itself of the $750,000 loan. This it never did, on November 1 or afterwards. Before, on, and after closing day and until early December Brown-Marx's communications with the bank focused on only the ceiling loan. The bank knew of the $1.1 million of liens on the building that Brown-Marx was to pay off with the proceeds of the ceiling loan. In its telegram to the bank on October 31 Brown-Marx said that its interim lenders would not extend their loans. So far as the bank knew Brown-Marx could not, with a $750,000 loan, be in a position to convey a first mortgage lien. On December 3 the bank expressly raised the possibility of closing the loan in the floor amount;

Smith responded with a rebuff and continued to insist on receiving the ceiling amount.

Under the undisputed material facts, Brown-Marx cannot recover for breach of the agreement to make a loan in the floor amount.

### IV. *Brown-Marx's tort claims*

#### a. The fraud claim

 Brown-Marx's fraud claim is based on the representations that it maintains were made by the bank via Mulcahy in the last few weeks before the abortive closing day: (1) that the bank was preparing for and would be ready to close the loan on November 1; (2) that the documents Brown-Marx had submitted were satisfactory and nothing more was required for closing; (3) that the loan would close on November 1. The court granted the bank's motion for directed verdict on this claim at the close of Brown-Marx's case in chief. Reviewing the evidence under *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969), standards we hold that the directed verdict was correct. Fraud in Alabama is defined as:

Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party.

2975 Code of Ala. Sec. 6–5–101. *International Resorts, Inc. v. Lambert,* 350 So.2d 391 (Ala.1977), sets out the four elements of a cause of action for legal fraud: false representation, materiality, reliance, and damage.

The district court found that the bank did not adequately prepare to close the loan on November 1. But under Alabama law failure to fulfill promises does not give rise to actionable fraud unless it is alleged and proved that the representations were made with intent to deceive and with no intent at the time the representations were made to carry them out. *Evans v. Adam's Rib, Inc.,* 289 Ala. 377, 267 So.2d 448, 450 (Ala.1972); *Bracewell v. Bryan,* 57 Ala.App. 494, 329 So.2d 552 (Ala.Civ.App.1976). Failure to perform a promise is not of itself adequate evidence of intent to support an action for fraud. *Id.* A mere breach of a contractual

provision is not sufficient to support a charge of fraud. *See McAdory v. Jones*, 260 Ala. 547, 71 So.2d 526, 528 (Ala.1954). There was evidence that the bank because of changes in the prevailing interest rates no longer considered the loan desirable, but there was no substantial evidence that the bank did not intend to honor the commitment if its terms were met.[6]

### b. The tort of bad faith

After the trial, Brown-Marx was granted leave to amend to add a new claim for breach of implied duty to deal in good faith. This claim is grounded on the same conduct complained of in the fraud claim. Brown-Marx maintains that the bank was subject to an implied covenant to deal in good faith to prepare for closing and to close the loan and that the bank intentionally and maliciously breached this duty. The court dismissed this claim with prejudice, reasoning that it was an attempt by Brown-Marx to state a claim for the "tort of bad faith," a newly recognized Alabama theory of recovery.[7] The court concluded, after examining the history of this new theory, that it is limited in application to bad faith by insurers failing to pay insurance claims.

It is possible for a tort to arise in Alabama out of a breach of a duty implied by or arising out of a contract,[8] but the Alabama Supreme Court has stated that an ordinary breach of contract will not give rise to a tort. *Bentley-Beale v. Wesson Oil & Snowdrift Sales Co.*, 231 Ala. 562, 165 So. 830, 832 (Ala.1936). Here there is no wrong independent of the contract. The gravamen of Brown-Marx's claim is the bank's failure to close on the appointed day, an

obligation plainly set out in the contract itself. From our examination of the Alabama law, and giving deference to the interpretation by a federal district judge sitting in that state, *see Alabama Electric Cooperative, Inc. v. First National Bank*, 684 F.2d 789, 792 (11th Cir.1982); we hold that Brown-Marx has failed to set out an actionable tort for breach of the duty of good faith.

### c. Remaining tort claims

About a week after the district court dismissed the claim for the tort of bad faith, Brown-Marx moved for leave to amend to add three more claims. The district court denied leave on the grounds of untimeliness, that the facts developed in the earlier trial did not support the proposed claims, and for the reasons stated in dismissing the bad faith claim. Each proposed new claim was based on the same conduct relied on in the dismissed bad faith claim. The motion was presented two years after the initial complaint was filed and only days before final judgment was entered. Among the factors that may justify denial of leave to amend are prejudice, undue delay, dilatory motive by movant, and repeated failure to cure deficiencies by amendments previously allowed. *See Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The denial of leave to amend was not an abuse of discretion.

AFFIRMED.

---

**6.** In a similar context the Sixth Circuit, applying Tennessee law, found that a change in interest rates is not sufficient to support an inference of fraud or bad faith. *See Gold v. National Savings Bank*, 641 F.2d 430, 434–35 (6th Cir.), *cert. denied*, 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 100 (1981).

**7.** *See e.g., Chavers v. Nat'l Security Fire & Casualty Co.*, 405 So.2d 1, 4–5 (Ala.1981) (intentional failure by insurer to perform duty to act in good faith in paying valid claim is actionable tort); *Gulf Atlantic Life Ins. Co. v. Barnes*, 405 So.2d 916, 924 (Ala.1981) ("Bad faith is the intentional failure by an insurer to perform the

duty implied by law of good faith in fair dealing.").

**8.** *See e.g., Sherrill v. Alabama Appliance Co.*, 197 So. 1, 4 (Ala.1940) ("A breach of it [the implied duty to use reasonable skill and diligence in carrying out the contract] imposes a liability for which sometimes an action in tort or assumpsit (one or either) is available."); *Bentley-Beale v. Wesson Oil & Snowdrift Sales Co.*, 231 Ala. 562, 165 So. 830, 832 (Ala.1936) (for example, the tort of malpractice arises out of a contract for delivery of professional services).