William Byrd and the individual partners comprising BBCGH Partners 1 (hereinafter collectively referred to as the "buyers") contracted with Putman Construction Realty Company, Inc., and its individual owners (hereinafter collectively referred to as the "sellers") for the purchase of University Square Business Center ("USBC"), a multitenant office complex. To obtain the primary financing for the purchase price, the buyers negotiated a $16.5 million loan from Northwestern Mutual Life Insurance Company (hereinafter "Northwestern"), which was secured by a first mortgage on the USBC property. At the closing of the sale, the buyers paid the sellers $15,719,800.61 in cash and executed a $1.5 million promissory note to the sellers for the balance of the purchase price. The buyers had previously paid the sellers $150,000 in earnest money and had paid an additional $483,006.75 in closing costs.
After the closing, the buyers paid the sellers over $110,000 in interest on the $1.5 million promissory note, until they discovered the alleged fraud that led to this lawsuit. They subsequently sued the sellers, alleging breach of contract, fraud, and intentional interference with business or contractual relations. *Page 963 
The sellers counterclaimed, seeking recovery on the $1.5 million promissory note the buyers had executed to them as part of their payment for USBC. The sellers later amended the counterclaim to include a count alleging the breach of an oral contract under which, the sellers say, the buyers agreed to pay $13,333 to the sellers as compensation for bringing additional renters to USBC.
After each side had rested its case at trial, the buyers filed an "Election of Remedy," which stated that the buyers "in their actions for fraud and contract, elect the remedy of rescission." The trial court initially denied this election, but later agreed to charge the jury on the issue. At the buyers' request, the court submitted two special interrogatories to the jury to determine whether the contract should be rescinded, and the jury answered in the affirmative. The jury returned a verdict in favor of the buyers on their claims of fraud and intentional interference with business and contractual relations and awarded punitive damages of $15,500. The jury found in favor of the sellers on their counterclaim alleging breach of the oral agreement with the buyers and awarded the sellers $13,300. On November 8, 1990, the trial court entered an order on the docket sheet setting out the jury's findings and ending with the following statement: "Judgment accordingly and cause continued for consideration by the Court on the issue of rescission." The sellers then filed a motion challenging the buyers' right to rescission. The trial court denied this motion, and the sellers appealed to this Court (case 1910959).
 I. The Sellers' Appeal
The sellers argue that, based on the facts, rescission was not the proper remedy to be applied in this case. It is necessary to begin by noting these facts from the record: Many of the tenants of USBC had short-term leases for office space. In 1988, three of the major tenants in the complex were TRW, Inc., the McDonnell-Douglas Corporation, and a division of the Army Corps of Engineers. In January 1989, the buyers negotiated a contract with the sellers to buy the complex. Throughout the next few months, while the buyers arranged financing to close the deal, they told the sellers that knowing the future leasing intentions of the tenants in the complex was critical. The parties discussed the matter during almost every meeting or phone call, and the sellers responded both orally and in writing. The sellers promised to keep the buyers "up to date" on the tenants' long-term lease plans and specifically asked the buyers not to contact the tenants directly to find out what their future leasing plans were.
The record shows that as early as December 1988, the sellers were aware that the Corps of Engineers was planning to build its own facility and eventually move into it; in fact, the sellers bid on the construction project themselves. In spite of this knowledge, the sellers repeatedly told the buyers that the Corps of Engineers had no intention of leaving USBC and that it would probably agree to lease even more space. The sellers learned in late February or early March 1989 that McDonnell-Douglas was considering shifting some of its employees to a new location, but did not mention this to the buyers. In May or June 1989, the sellers learned that McDonnell-Douglas was definitely going to move some of its personnel to new facilities, but did not report this information to the buyers. In March 1989, TRW sent a letter to the sellers to inform them that it would be relocating and would not renew its lease; the sellers did not inform the buyers of this notification.
In early June 1989, the buyers paid the sellers $150,000 in earnest money on the purchase of the property. They thereafter applied to Northwestern for the $16.5 million loan. The buyers paid Northwestern a $250,000 nonrefundable application fee and an additional $250,000 confirmation fee when the loan was approved.
Shortly thereafter, the buyers learned of TRW's intention not to renew its lease. The sellers claimed that the letter they received from TRW had been "misfiled" and that they were "embarrassed" about their failure to report TRW's intent not to renew the lease. Because they had already invested $500,000 in nonrefundable fees, the buyers did not believe they could afford to back out of the contract. The buyers did not know that the Corps of Engineers and McDonnell-Douglas *Page 964 
were also planning to vacate their leases. To appease the buyers about the TRW lease and to ensure the closing of the deal, the sellers agreed to modify the purchase contract by placing $209,000 in escrow; that was the amount of rent that TRW would have paid for one year's rent in the complex. The buyers thereafter received monthly payments from this escrow account.
In July 1989, the parties closed the deal on the sale of the office complex. At that time, the buyers specifically asked if any more major tenants were planning not to renew their leases; the sellers assured them that there were no more "surprises" like TRW's nonrenewal and that they did not know of any other tenants who were planning to vacate their offices at USBC.
Shortly after the closing, the buyers learned that the Corps of Engineers was planning to vacate its offices at USBC and move into its new building. In June 1990, the buyers discovered McDonnell-Douglas's plans to relocate from the office complex and also learned that the sellers had had knowledge of the planned relocation before they closed the deal. At that point, the buyers stopped payment on the promissory note to the sellers and sent them a letter demanding a rescission of the contract.
The sellers argue that the buyers waived their right to rescind the contract by going forward to close the deal after learning of the alleged fraud and by entering into a contractual modification that compensated them for the loss of the TRW lease. To bolster their argument, the sellers cite the early case of Hunt v. Jones, 203 Ala. 541, 84 So. 718 (1919), wherein this Court indicated that the right to rescind a contract on the basis of fraud is lost when a party, upon discovering the fraud, does not give notice of a rescission but instead undertakes to settle the conflict and affirm the contract. The record reveals, however, that the buyers did not seek to rescind the contract based on the sellers' nondisclosure of TRW's future leasing plans but, rather, for the sellers' fraud in regard to the Corps of Engineers and McDonnell-Douglas leases. The buyers' complaint does not allege any fraud concerning the TRW lease, nor was any such fraud mentioned in the buyers' proposed jury charges. At trial, the buyers specifically informed the jury that evidence of the facts surrounding the TRW lease was introduced merely to establish the sellers' pattern and practice of fraud and that it was not the basis for the fraud action. The buyers specifically sought damages based solely upon the fraud arising from the Corps of Engineers and McDonnell-Douglas leases.
It is undisputed that the buyers did not discover the fraud surrounding these two leases until after the closing; the right to rescind the contract based upon this fraud did not accrue until that time. The fact that the buyers did not seek a rescission based on any TRW-related fraud did not affect their right to seek such a remedy for fraud they discovered later. A party cannot be charged with a waiver where the party does not have, at the time of the alleged waiver, knowledge of all the material facts upon which the alleged waiver depends.Nelson Realty Co. v. Darling Shop of Birmingham, 267 Ala. 301,101 So.2d 78 (1958); Brown-Marx Assocs., Ltd. v. Emigrant Sav.Bank, 703 F.2d 1361 (11th Cir. 1983). We, therefore, conclude that no such waiver exists in this case.
The sellers next argue that the buyers did not include a claim for rescission in their complaint and therefore could not elect the remedy after both parties had rested their cases at trial. We find no merit in this argument. The record shows that the buyers' complaint set out claims alleging fraudulent inducement and demanded equitable relief based on this claim. Moreover, prior to trial the parties exchanged proposed jury charges, a number of which directly addressed the issue of rescission. A claim for relief is proper if it gives the opponent fair notice of the pleader's claim and the grounds upon which it rests. Archie v. Enterprise Hospital NursingHome, 508 So.2d 693 (Ala. 1987). The requirements of Rule 8, A.R.Civ.P., are met if the claim for relief gives the opponent fair notice of the pleader's claims and the grounds upon which it rests. Barton v. Alabama Elec. Co-op., 487 So.2d 884 (Ala. 1986). In view of the record, we must conclude that the buyers gave the defendants adequate notice of the claim of rescission. *Page 965 
The sellers next argue that rescission is not proper because the buyers did not bring their fraud action until one year after they had learned of the defendants' failure to inform them that TRW would not be renewing its lease in USBC. The sellers point out that in order to rescind a contract for fraud, a party must do so within a reasonable time after the fraud was discovered or should have been discovered. However, as stated earlier, the buyers did not base their action on the TRW lease but, rather, on the Corps of Engineers and McDonnell-Douglas leases. The record shows that the buyers did not learn of the defendants' fraud in relation to the McDonnell-Douglas lease until June 1990. On October 16, 1990, the buyers sent a letter to the sellers demanding rescission of the contract. The buyers learned of the full effect of the fraud regarding the Corps of Engineers lease in May 1991, and in August 1991 they discovered the complete facts surrounding the fraud regarding the McDonnell-Douglas lease. A party is under no duty to seek rescission until he knows both of the existence of the fraud and the full injurious effect thereof.Stafford v. Colonial Mortgage Bond Co., 221 Ala. 636,130 So. 383 (1930). In view of this, we hold that the buyers' demand for rescission was timely.
The sellers next argue that the buyers' October 16 letter waived their right to rescission, because it proposed an "alternative" and was therefore not an unequivocal election of the remedy. The pertinent portion of that letter reads:
 "Pursuant to Paragraph 24 of the agreement for purchase and sale of real property dated January 13, 1989, the purchasers hereby give notice as follows: The purchaser hereby demands that you rescind all contracts you made with the purchaser of and relating to said purchase of real property, and that you put the purchaser in the same position, in all respects, that it would have occupied had it not entered into said agreement to purchase real property. Alternatively, the purchaser hereby demands that you provide all items required by the aforementioned contract upon which the exercise of the purchaser's option to purchase Parcel C is conditional, such as a survey of the land and a commitment for title insurance."
(Emphasis added.) The sellers point out that anexpress affirmance of the contract by word or act after discovery of the fraud defeats the right of rescission. Wilcuttv. Union Oil Co. of California, 432 So.2d 1217 (Ala. 1983). Because the buyers included the word "alternatively" in the foregoing provision of the letter, the sellers conclude that the buyers affirmed the contract. However, under Alabama law, a waiver requires the intentional relinquishment of a known right, and that intentional relinquishment must be shown in an unequivocal manner. In re Leon's Casuals Co., 122 B.R. 768
(Bankr.S.D.Ala. 1990) (citing Isom v. Johnson, 205 Ala. 157,87 So. 543 (1920)). Here, by presenting an alternative to rescission, the buyers equivocated on the remedy they would pursue. After sending the letter, the buyers stopped paying on the promissory note to the sellers, an act inconsistent with the waiver of their right to rescission. Moreover, the record shows that when the buyers sent this letter they did not fully know the nature, extent, and injurious effect of the sellers' fraud. Whether the buyers intended to waive their right to rescission and whether they had the knowledge necessary to do so in an informed manner are both jury questions. Braswell WoodCo. v. Fussell, 474 So.2d 67 (Ala. 1985) (intent to waive remedy is issue for the jury); Hagood v. Knight, 257 Ala. 64,57 So.2d 616 (1952) (timeliness of election to rescind is a jury question). Here, the jury was presented with the facts set out above and it determined that rescission was the proper remedy. In view of the evidence before us, we hold that the jury's verdict should not be disturbed.
In their final argument, the sellers claim that the buyers could have obtained an award of money damages in this case and that rescission was, therefore, an improper remedy. By instituting their lawsuit, the buyers sought to rescind the executed purchase contract and deed, to reconvey the complex to the sellers, and to obtain the return of the purchase price. The evidence shows that they executed the contract based in large part on their belief that the major *Page 966 
tenants of the complex would continue to lease space there and would probably increase the amount of space they leased. The record shows that with the departure of its major tenants, the USBC does not have the profit potential the buyers bargained for and is, in fact, a liability to them. While the buyers could receive money damages to approximate the value of the lost leases, such an award would be speculative at best and would not abrogate the fact that the buyers now have a property that operates at an increasing loss. The equitable remedy of rescission, while difficult to execute, would more completely provide the buyers with the compensation they seek. The jury was, therefore, correct in determining that rescission is the proper remedy to be applied in this case.
 II. The Buyers' Appeals
While the sellers' appeal was pending, the trial court held a restoration hearing to determine the means of the rescission. At the hearing, an agent for Northwestern stated that Northwestern had amended its promissory note with the buyers to release them from liability for $15 million of the outstanding loan. Under this agreement, Northwestern's remaining recourse was to seize USBC; however, in view of the circumstances, the agent stated that Northwestern would accept a direct payment of $16,994,064.38 to satisfy the debt.
In its resulting order, the trial court first made the following findings of facts with regard to the buyers' liability to Northwestern: (1) that the letter of commitment, the promissory note, and the guarantee executed to Northwestern by the buyers provided that the buyers were to be released from liability for repayment of most of the Northwestern loan, subject to certain conditions, which were met in this case; (2) that the provisions of these documents made the partnership and individual partners liable for repaying only any amount in excess of $15 million, plus amounts for real estate taxes, actual operating costs, insurance, outstanding claims for liability, and tenant improvements; (3) that the buyers were to remain liable for these expenses, but must be indemnified by the sellers for amounts up to $103,000; (4) that, under the foregoing provision, the buyers' personal liability on the loan was only $1.5 million at the time of the closing and that amount had been paid; and (5) that Northwestern's recourse for collection is now limited to the USBC property itself. Based on these findings of fact, the trial court concluded:
 "Having found that both BBCGH Partners 1 and the individual partners have been released from liability to Northwestern . . ., the Court concludes that it would be wholly inequitable to require the defendant sellers to pay the approximately $17.2 million which Northwestern has indicated it would accept in satisfaction of the loan. An order requiring the defendant sellers to satisfy the Northwestern mortgage not only would force them to pay to Northwestern amounts far in excess of what they actually received from the sale of [USBC], but it would also require them to pay millions of dollars more than the plaintiffs were ever obligated to pay. In fact, it would be $17.2 million more than the plaintiffs are obligated to pay at this time. Such an order would constitute an enormous financial penalty to the defendant sellers and a bonus to the plaintiffs and to Northwestern. Given today's business climate, such an order could very well be impossible to perform in any event. An order of this type would not restore the parties to the relative positions they occupied before the contract was made and would be entirely inconsistent with the equitable nature of the rescission remedy."
The court required (1) that the buyers pay $154,704.56 in outstanding property taxes on USBC and then convey the property back to the sellers, and (2) that the sellers accept the conveyance of USBC, subject to the buyers' outstanding mortgage to Northwestern. The court voided the $1.5 million promissory note between the buyers and the sellers; however, the court did not require the sellers to return the $100,000+ in interest payments the buyers had already made to them on this note. The court held that, pursuant to their mortgage agreement, the buyers were released from their $16.5 million debt to Northwestern and the sellers were to replace the *Page 967 
buyers in the loan agreement with Northwestern. The court did not require the sellers to repay the $16.5 million in cash that they received from the buyers, nor did it order them to return the sizable closing costs that the buyers paid.
After the trial court entered its order, the buyers filed a motion for post-judgment relief, along with a motion to stay execution of the court's order. Northwestern filed a motion to intervene in the lawsuit, pursuant to Rule 24, A.R.Civ.P. All of these motions were denied, and both the buyers (case 1911343) and Northwestern (case 1911428) appealed to this Court. The buyers also filed an emergency motion with the trial court for a stay of execution of the judgment pending the appeal and for approval of a supersedeas bond in the amount of $18,750. The court granted the stay but denied the request for approval of the bond, holding that the execution of the judgment would not be stayed unless the buyers posted a bond of $250,000 and agreed to pay any costs incurred by the sellers in the event that the buyers' appeal to this Court was unsuccessful. The buyers then filed a second appeal (case 1911454), challenging the trial court's ruling on the supersedeas bond.
The buyers argue that the trial court's restoration order is improper because it allows the sellers to regain ownership of USBC without returning the $15.7 million in purchase money that the buyers paid to them, thus allowing them to profit from their fraud. The buyers point out that rescission is restitutionary in the sense that the parties may be required to return what they have received and return a situation to its status quo. C. Gamble, Alabama Law of Damages § 34-6 (2d ed. 1988). One who seeks rescission of a real estate contract must first restore the consideration received; thereafter, the land becomes the vendor's as though no contract had existed and the money in the hands of the seller becomes the property of the purchaser. Chandler v. Wilder, 215 Ala. 209, 110 So. 306
(1926). In an action for restitution in which the benefit received was money, the measure of recovery for this benefit is the amount of money received. Restatement of Restitution § 28, comment (a) (1937). When rescission is ordered, the proper remedy is to restore all parties to the status quo ante, and each party should be placed in a position that it would have occupied had the conveyance not been made. Clark v. Wilson,380 So.2d 810 (Ala. 1980). Based on these principles, the buyers seek a direct repayment of all amounts they paid to the sellers, including the $16.5 million purchase price, $483,006.75 in closing costs, $121,000 in interest payments they paid to the sellers on the $1.5 million note, $3,613,200 in mortgage payments to Northwestern, and the $500,000 in nonrefundable fees the buyers paid to Northwestern to obtain the loan.
We note that in fashioning the means of equitable relief, a trial court has the power to mold its judgment so as to adjust the equities of all parties and to meet the obvious necessities of each situation. Clark v. Cowart, 445 So.2d 884 (Ala. 1984). In this case, the trial court's task was a difficult one. At first glance, its order does appear to bestow a "double benefit" upon the sellers, because it allows them to regain USBC without returning the purchase price; however, it does require that the sellers assume ownership subject to the Northwestern mortgage. A party acquiring property subject to a mortgage does not incur a personal obligation to pay it off, but must do so if it wishes to protect its interest in the property. Trauner v. Lowrey, 369 So.2d 531 (Ala. 1979). Accordingly, the sellers will be forced to pay the mortgage if they wish to remain in possession of USBC after it is reconveyed to them. The trial court correctly recognized that the $18 million required to pay off this mortgage greatly exceeds the amount by which the defendants actually profited from the sale of USBC. Of the approximately $17.3 million purchase price, over $6 million was used to satisfy five outstanding mortgages on USBC so that the buyers could receive the property without encumbrance. After various other payments and taxes, the sellers realized an actual profit of slightly over $6 million.
We agree with the trial court that a reconveyance of USBC to the sellers, subject to the mortgage, "constitutes the most equitable result which can be achieved." Accordingly, *Page 968 
we affirm those portions of the court's order relating to the reconveyance of USBC subject to the mortgage, the buyers' residual liability to Northwestern, and the sellers' mandatory indemnity to the buyers for these costs, up to $103,000. We must also recognize, however, that the buyers incurred other substantial out-of-pocket costs to finance a transaction that was born out of the sellers' fraud. After carefully considering the evidence in this case, we conclude that repayment of the following costs is necessary to more equitably restore the buyers to the position they occupied before the sale: $483,006.75 in closing costs on the purchase of USBC; $121,000 in interest payments they paid to the sellers on the $1.5 million note; and the $500,000 in nonrefundable fees the buyers paid to Northwestern to obtain the loan, along with the proper amount of interest due on these amounts. We therefore must reverse the judgment to the extent it denied a restoration of these additional costs incurred by the buyers. We remand this case for the trial court to enter a judgment ordering repayment of these costs. Because of our holding on the appeal from the restitution judgment, the buyers' appeal from the order setting the supersedeas bond is moot.
 III. Northwestern's Appeal
Northwestern argues that the trial court erred in failing to grant its Rule 24 motion to intervene. A movant seeking intervention as a right must (1) file a timely motion; (2) show that he has the requisite interest in the matter before the court; (3) show that this interest is subject to some risk of impairment as a practical matter, and (4) show that the interest is not already adequately represented. Rule 24(a), A.R.Civ.P.
In this case, the latter three requirements have been met; however, in its order denying the motion, the trial court specifically held that Northwestern's attempt to intervene was not timely. The record shows that Northwestern had been aware for several months prior to the restoration hearing that the buyers had sued the sellers and were seeking equitable relief. Northwestern was aware on the day the jury rendered its verdict that a rescission would take place. Attorneys for Northwestern were present at the restoration hearing, and an official for the company testified during the proceeding. Northwestern nevertheless failed to seek intervention until after the trial court entered its rescission order six months after the jury had rendered its verdict.
In Randolph County v. Thompson, 502 So.2d 357 (Ala. 1987), we noted that post-judgment motions for intervention have not been met with favor in the courts of this state. The trial court is given a wide degree of discretion in determining whether the motion should be granted, and its judgment will not be reversed absent an abuse of this discretion. Randolph County.
Northwestern points out that in Randolph County we stated courts should be reluctant to dismiss as untimely a request for intervention as a matter of right, because the would-be intervenor may be seriously harmed if its motion is not granted. We note, however, that the party seeking intervention in that case filed its Rule 24 motion one week after it first became aware of the litigation affecting its interest; thus, the delay was not the result of any dilatory conduct on the part of the intervenor. We also note that our decision inRandolph County was based on unusual facts peculiar to that case and not paralleled in the matter before us now.
For purposes of Rule 24, timeliness is assessed with regard to the length of time during which the would-be intervenor knew or reasonably should have known of his interest in the case.Campbell v. Hall-Mark Electronics Corp., 808 F.2d 775 (11th Cir. 1987). Here, the record confirms that Northwestern knew of, and even participated in, the proceedings that it now belatedly seeks to join as a matter of right. In view of this, we find no error in the trial court's denial of Northwestern's motion to intervene.
1910959 AFFIRMED.
1911343 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED. *Page 969 
1911454 DISMISSED AS MOOT.
1911428 AFFIRMED.
HORNSBY, C.J., and ADAMS, KENNEDY and INGRAM, JJ., concur.