[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 196 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 197 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 198 
Vicki Edwards appeals from judgments for Allied Home Mortgage Capital Corporation on its claims against Edwards and on her counterclaims against Allied. All those claims arose from Edwards's employment with Allied between 1997 and 2003. For the reasons discussed below, we affirm in part and reverse in part.
 Facts and Procedural History
Allied, which is based in Houston, Texas, is a mortgage-brokerage company engaged in procuring, facilitating, and funding home-mortgage loans. In 1997 Allied employed Edwards as the manager of its branch office in Huntsville. As branch manager, Edwards's principal duties were the marketing of Allied's services in the Huntsville area, the operation of the branch, the procurement of customers, the generation of loan applications, the prequalification of borrowers, and other support services to borrowers and lenders related to the closing of loans secured by home mortgages.[1]
Edwards's employment was terminable at will either by her or by Allied. The terms of Edwards's employment and her responsibilities as branch manager were detailed in a branch operating/employment agreement executed on October 3, 1997 ("the agreement"). The agreement specified that Edwards was solely responsible for the profitability of the branch. Accordingly, Edwards had the responsibility for paying for utilities, rent, payroll, equipment, furniture, office supplies, federal employment taxes, and all other operating expenses related to the branch (collectively hereinafter "the branch-operating expenses").
Revenues for the services Allied provided were generated upon the closing of loans that originated through the Huntsville branch. The lender who funded the loan designated the closing attorney. That attorney was authorized to remit part of the loan proceeds to Allied as compensation for the loan origination or other services the Huntsville branch office provided for a closing. Following a closing originated through the Huntsville branch office, the closing attorney would send the branch a check payable to Allied for the sum of all fees owed for Allied's services (including amounts owed to any third-party vendor).[2] *Page 199 
The agreement specified the responsibilities of Edwards and Allied for handling, accounting, and distributing revenues generated from loans closed through the branch. Paragraph 2.8 of the agreement stated:
 "2.8 All monies received by [Edwards] for [Allied] or to be held for others shall be made payable to [Allied] and received in trust by [Edwards] for [Allied] and delivered immediately to [Allied]. [Edwards] shall open no bank accounts in [Allied's] name."
Along with the closing checks payable to Allied, Edwards also sent Allied's corporate office copies of the settlement statements that detailed the disbursement of funds at closings and income-distribution reports she prepared to facilitate the accounting of revenues between Allied and the Huntsville branch office.
After Edwards sent the closing checks to Allied, the corporate office was authorized to remove two types of charges from those revenues. First, pursuant to Allied's policies and procedures, Allied's corporate office paid all branch-operating expenses. This obligation was reflected in paragraph 2.3 of the agreement, which stated Allied was to "promptly pay all bills for [the branch-operating expenses] previously approved by [Edwards] up to the total cash available to the Branch . . . subject to the billings for such being promptly submitted to [Allied]." Second, Allied was authorized in paragraph 3.2 of the agreement to deduct and pay itself .30% of the amount of each loan closed by the Huntsville branch office ("the corporate fee"). The corporate fee was Allied's compensation for its support of the Huntsville branch office.
After Allied paid the branch-operating expenses and deducted its corporate fee, the remaining funds were retained in an account for the benefit of the Huntsville branch office ("the branch account"). Allied did not pay Edwards a salary or guarantee her form of compensation. Edwards could, however, request draws from her branch account for any purpose. When Edwards withdrew funds from the branch account, Allied sent her a check and generated a W-2 statement for federal income tax purposes. Moneys remaining in the branch account after Allied made the authorized deductions were profits or commissions to Edwards for her services.[3]
Edwards testified at trial that she maintained independent personal records in the Huntsville branch office that reflected what she considered to be the proper balance in the branch account. During the early years of the agreement, the Huntsville branch office and Allied's corporate office had a minimal number of accounting issues concerning the administration of the branch. According to Edwards, however, she noticed accounting discrepancies beginning around 1999, and Allied began failing to pay (or to pay timely) the branch-operating expenses, failing to properly debit payroll taxes and other charges, failing to pay draws from the branch account upon Edwards's request, and failing to properly calculate the corporate fee on transactions. Around that time, Edwards testified, she made dozens of oral inquiries and complaints to Allied's officials and members of its staff about Allied's handling *Page 200 
of the branch account. Also, Edwards testified that Allied, which was then experiencing a period of high growth and high employee turnover, was not responsive to her complaints about Allied's failure to perform certain of its duties under the agreement. Edwards did not send Allied any written documents (correspondence, e-mail messages, facsimiles, etc.) reflecting her complaints concerning the corporate office's administration of the agreement.
Beginning in 1998, Edwards began retaining checks that were payable to Allied. Between February 1998 and August 1999, Edwards deposited into one of her personal accounts checks totaling $346 payable to Allied. In December 2000 Edwards opened an account at SouthTrust Bank in the name of "Vicki W. Edwards D/B/A Allied Mortgage Capital Corporation" ("the d/b/a account"). Between December 2000 and August 2003, Edwards received, endorsed, and deposited into the d/b/a account checks payable to Allied totaling approximately $381,000. Between the late 1990s and 2002, Edwards deposited checks payable to Allied totaling approximately $44,000 into other bank accounts controlled by Edwards or her husband. The total face value of checks payable to Allied that Edwards deposited into her personal accounts between 1998 and August 2003 was approximately $425,309. Most of those funds were generated from checks issued to Allied on closed loans originated by the Huntsville branch office. Edwards did not advise Allied or obtain its consent before depositing those checks into her personal accounts. According to Edwards, she retained and deposited those checks out of her frustration in dealing with Allied on accounting questions related to the branch account.
Morever, on those closed loans that Edwards did not disclose to Allied and for which she retained checks payable to Allied, Edwards did not (1) calculate and send Allied its corporate fee or (2) send Allied the settlement statements or income-distribution reports Edwards furnished on the closings she did report to the corporate office. During the same period in which Edwards did not report certain closings, on many other loans originated through the Huntsville branch office she did send Allied checks and closing documents. Both parties used the accounting practices contemplated by the agreement on those loan closings Edwards reported to Allied.
Further, after Edwards opened the d/b/a account in 2000, she began directly paying many branch-operating expenses through the d/b/a account without submitting those expenses to Allied for payment by the corporate office. According to the trial testimony of Edwards's accountant, Edwards directly paid approximately $155,000 of such expenses through the d/b/a account. During the same period in which Edwards did not report all closings, she submitted, and Allied continued to pay, certain branch-operating expenses in the manner contemplated by the agreement.
Allied performed an audit of the Huntsville branch office in 2002. At that time, Allied did not discover, and Edwards did not disclose, that she had retained checks payable to Allied and had not reported all loan closings. Further, Allied was unaware at that time that Edwards had directly paid branch-operating expenses from the d/b/a account in violation of the procedures in the agreement. Edwards testified that at the time of the 2002 audit she considered the agreement still effective.
By 2003, Allied began to question the capability of Edwards's branch to interface with its corporate computer network. Further, an Allied auditor reported to the corporate office that, during an August 11, *Page 201 
2003, visit to the branch, the auditor was not treated in a businesslike manner. Immediately after that visit, Allied terminated its agreement with Edwards and closed the Huntsville branch office effective August 13, 2003.
Allied owned all the records at the Huntsville branch office that related its mortgage-loan business.[4] In connection with terminating the agreement, representatives of Allied appeared at the Huntsville branch office on August 13, 2003, without advance notice to Edwards, stated their intention to secure all files related to Allied's business, and removed 45 boxes of documents from the premises. Upon inspecting those records, Allied discovered a notice from SouthTrust concerning the d/b/a account.
After learning that Edwards had opened the d/b/a account without its permission and had not reported certain loan closings, Allied sued Edwards on September 3, 2003, seeking damages for violation of the agreement. On Allied's motion, the trial court entered a temporary restraining order directing Edwards to deliver to Allied any closing checks payable to Allied that were then in Edwards's possession ("the checks on hand"). Edwards complied with that order and delivered to Allied a total of approximately $141,000 of checks on hand, generated from closings that occurred between May 2003 and August 2003.
On October 9, 2003, the trial court entered a preliminary injunction ordering an accounting of all loans closed by the branch, directing Edwards to return to Allied any personal property in her possession that was owned by Allied that Allied did not take on August 13, and freezing certain of Edwards's assets pending the accounting. After Allied deposited the checks on hand and deducted its corporate fee and other charges from the branch account, the balance in that account in June 2004 was $125,300 ("the branch-account closing balance").
Allied asserted multiple claims in its action against Edwards. In its breach-of-contract claim, Allied alleged that Edwards (a) violated paragraph 2.8 of the agreement when she did not deliver closing checks payable to Allied and opened bank accounts in both her and Allied's names, and (b) used Allied's name in violation of paragraph 2.16. Additionally, Allied claimed that Edwards fraudulently suppressed the existence of loan closings and checks payable to Allied; converted those checks by endorsing and depositing them into her personal accounts; and breached a fiduciary duty owed to Allied to report loan closings and forward related checks and documents to Allied.[5]
Edwards filed several counterclaims. In her breach-of-contract counterclaim, Edwards alleged that Allied failed to perform its obligations under the agreement by not paying (or by paying late) the branch-operating expenses; failing to pay Edwards commissions that she had earned; improperly diverting, or incorrectly accounting for, moneys in the branch account; and not paying the branch-account closing balance to Edwards. Additionally, *Page 202 
Edwards claimed that, on August 13, 2003, Allied (a) trespassed when its representatives refused to leave the Huntsville branch office when requested,[6] and (b) converted items of personal property (i.e., her personal financial records and family memorabilia) that were in the boxes of records that Allied removed from the Huntsville branch office that day.
On November 11, 2004, Allied moved for partial summary judgment on its conversion, breach-of-fiduciary-duty, and fraudulent-suppression claims against Edwards. The trial court partially granted that motion with respect to liability on Allied's conversion and fraudulent-suppression claims, but withheld ruling on damages for those tort claims.
The case proceeded to a trial before a jury on September 12, 2006. At trial, Allied's evidentiary presentation centered on proof of the agreement, an explanation of the branch-accounting procedures contemplated by the agreement, Edwards's retention of checks payable to Allied, the face amounts of those checks, and proof of the attorney fees and other litigation expenses Allied had incurred.[7] Edwards offered testimony about the following topics, among others, at trial: the accounting discrepancies she orally reported to Allied; Allied's failure over the term of the agreement to pay her approximately $215,000 (excluding interest) on transactions she had reported to Allied and that were processed using the accounting procedures contemplated by the agreement; Edwards's direct payment of approximately $155,000 in branch-operating expenses through the d/b/a account without requesting that Allied pay those expenses; Allied's retention of the branch-account closing balance (i.e., $125,300) when the agreement was terminated; and the events of August 13, 2003, when Allied's representatives removed boxes, which purportedly included Edwards's personal property, from the Huntsville branch office.
After more than nine days of trial, the trial court entered a judgment as a matter of law ("JML") in favor of Allied on its breach-of-contract and breach-of-fiduciary-duty claims against Edwards. The trial court also entered a JML for Allied on Edwards's breach-of-contract counter-claim.[8] Following those rulings, the only questions remaining for the jury were (a) the amount of compensatory damages to be awarded to Allied on its claims against Edwards of conversion, fraudulent suppression, breach of fiduciary duty, and breach of contract, and (b) the determination of liability and damages, if Allied was found liable, on Edwards's conversion and trespass claims against Allied that arose from the events of August 13, 2003.
On September 25, 2005, the jury awarded damages of $513,972 to Allied on its conversion, fraudulent-suppression, and breach-of-fiduciary-duty claims. On Allied's breach-of-contract claim, the jury *Page 203 
awarded an additional $308,369 as compensatory damages for the litigation expenses it had incurred.[9] The jury returned a verdict in favor of Allied on Edwards's conversion and trespass claims. On October 31, 2005, the trial court denied Edwards's motion to alter, amend, or vacate the judgment that it had entered in favor of Allied in accordance with the jury verdict. Thereafter, Edwards timely filed this appeal; she contests multiple rulings by the trial court on liability and damages issues, seeks reversal of the judgment entered for Allied, and requests a new trial of all claims and counterclaims that were adjudicated below.
 Issues Presented for Review
The following four questions are raised on appeal: (1) Did the trial court err in its rulings related to the jury's award of $513,972 as compensatory damages on Allied's tort claims? (2) Was the JML for Allied on its breach-of-contract and breach-of-fiduciary-duty claims proper? (3) Was the JML for Allied on Edwards's breach-of-contract counterclaim proper? and (4) Did the trial court commit reversible error when it (a) allowed Allied to cross-examine Edwards concerning (and subsequently introduce into evidence) her amended federal income tax returns, and (b) sustained Allied's objection to, and allegedly chastised Edwards's counsel concerning, Edwards's argument about Allied's failure to call one of its executives as a witness?
 1. Compensatory Damages for Allied's Tort Claims
The jury awarded $513,972 as compensatory damages on Allied's conversion, breach-of-fiduciary-duty, and fraudulent-suppression claims. That award consists of $425,309 in actual compensatory damages (i.e., the face value of the checks payable to Allied that Edwards retained and deposited into her personal accounts) and approximately $89,000 in prejudgment interest. Before closing argument, the trial court ruled that Edwards's counsel was prohibited from arguing to the jury (a) that Allied's damages related to the checks retained by Edwards and deposited into her accounts were less than the face value of those instruments or (b), alternatively, if Allied's interest in those checks was the face value of the checks, that the amount of damages should be mitigated by (i) $155,000 (the amount of branch-operating expenses Edwards paid directly from the d/b/a account) and (ii) the branch-account closing balance ($125,300) retained by Allied.[10] We apply a de novo standard in reviewing the conclusions of law on which the trial court based those rulings. BT Sec. Corp. v. W.R. Huff Asset Mgmt.Co., 891 So.2d 310, 312 (Ala. 2004).
Paragraph 2.8 of the agreement provided: "All monies received by [Edwards] for [Allied] or to be held for others shall be made payable to [Allied] and received in trust by [Edwards] for [Allied] and delivered immediately to [Allied]." Edwards does not dispute that, during the term of the agreement, she deposited into her personal accounts checks totaling $425,309 that were payable to Allied. Further, it is undisputed that Edwards did not disclose to Allied the existence of those checks and *Page 204 
the related loan closings that generated those funds. Based largely on those facts, the trial court found Edwards liable on Allied's conversion and fraudulent-suppression claims when Allied moved for a partial summary judgment.[11] Edwards's challenge concerning the judgment entered on Allied's tort claims is limited to the amount of compensatorydamages.
Edwards argues that the jury's award on the tort claims (i.e., the principal sum of $425,309) exceeded Allied's actual loss. Under the agreement, Allied retained a corporate fee of 0.30% of the amount of each closed loan that originated through the branch. Edwards's accountant testified at trial that, if Edwards had sent Allied the $425,309 in checks she had retained and deposited into her personal accounts, the corporate fee earned by Allied on the related closings would have totaled $64,467. Jeannie Seach, Allied's representative at trial, testified that Allied would have retained between $67,000-$80,000 in additional corporate fees if Edwards had forwarded all closing checks to Allied. Accordingly, Edwards argues that Allied's actual economic loss on the checks Edwards retained could not have been $425,309, but was $64,467.
Allied contends that the trial court did not err when it prohibited Edwards from arguing to the jury that Allied's interest in the checks retained by Edwards was less than the aggregate face value of the checks or that the $425,309 damages amount should be mitigated. According to Allied, Edwards had no interest in the converted checks under the agreement, and she forfeited any right to argue mitigation by concealing loan closings and retaining checks associated with those closings that were payable to Allied.
Counsel for Allied waived its claim for punitive damages in his opening statement. Further, the only damages that Allied proved at trial concerning its tort claims were Edwards's retention of checks payable to Allied totaling $425,309.[12]
Both parties reference § 7-3-420, Ala. Code 1975, in support of their respective arguments. That section, which addresses the conversion of checks and other negotiable instruments, states:
 "(a) An instrument is converted under circumstances which would constitute the conversion under personal property law. . . .
 "(b) In an action under subsection (a), the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument."
(Emphasis supplied.) The Official Comment to § 7-3-420(b) states:
 "The `but' clause in subsection (b) addresses the problem of conversion actions in multiple payee checks. Section 3-110(d) states that an instrument cannot be enforced unless all payees join in the action. But an action for conversion might be brought by a payee having no interest or a limited interest in the proceeds of the check. This clause prevents such a plaintiff from receiving a windfall. An example is a check payable to a building contractor and a supplier of building material. The check is *Page 205 
not payable to the payees alternatively. . . . The check is delivered to the contractor by the owner of the building. Suppose the contractor forges supplier's signature as an indorsement of the check and receives the entire proceeds of the check. The supplier should not, without qualification, be entitled to recover the entire amount of the check from the bank that converted the check. Depending upon the contract between the contractor and supplier, the amount of the check may be due entirely to the contractor . . ., entirely to the supplier . . ., or part may be due one and the rest to the other. . . ."
(Emphasis supplied.)
Edwards argues that the qualifying clause in § 7-3-420(b) limits Allied's compensatory damages for the conversion of the checks to the amount of the corporate fee Allied would have earned had Edwards forwarded those instruments to Allied. Allied does not contest that the face value of the checks retained by Edwards exceeds the aggregate corporate fee it would have earned from the related closings. On the other hand, Allied argues that the Official Comment to § 7-3-420(b) restricts the qualifying language in subsection (b) to circumstances involving multiple-payee checks. Because the checks converted by Edwards were payable to Allied exclusively, Allied argues, the "measure of liability" and Allied's interest in those checks is their face value. Further, Allied asserts that Edwards's right to compensation or to receive credit for expenses she paid from the checks she converted are contract, not tort, considerations that are not germane to the interpretation of § 7-3-420(b).
Allied's arguments on the compensatory-damages issue are not well-founded. The trial court should not have prohibited Edwards from arguing to the jury that Allied's interest in the converted checks was less than their face value. This Court is bound by rules of statutory construction "to interpret the language of [a statute] to mean exactly what it says and to give effect to the apparent intent of the legislature."IMED Corp. v. Systems Eng'g Assocs. Corp.,602 So.2d 344, 349 (Ala. 1992). The first clause in § 7-3-420(b) states that the measure of liability is presumed to be the amount payable on the instrument. Although the statute creates that presumption, the plain language in the clause that immediately follows the first clause indicates that the measure of liability is not equal to the face amount if the "recovery . . . exceed[s] the amount of the plaintiffs interest in the instrument." The Official Comment to § 7-3-420(b) states that the purpose of that qualifying clause is to "prevent . . . a plaintiff [with no interest or little interest in the proceeds of the check] from receiving a windfall." That Comment concludes that the amount of recovery for conversion of a check could be "depend[ent] upon [a] contract" between the parties.
Section 7-3-420(b), Ala. Code 1975, creates a rebuttable presumption that the amount of compensatory damages for conversion of a negotiable instrument is the face value of the instrument.[13] Here, Allied presumptively established that Edwards's liability for her conversion of checks payable to Allied was $425,309 (i.e., the face value of the converted checks). Edwards rebutted that presumption, however, when she presented testimony that, considering the rights of the parties in the agreement, Allied's "interest" *Page 206 
in those checks was $64,467 — the aggregate corporate fee Allied would have earned had Edwards delivered the closing checks she had retained to Allied. Compensatory damages are intended to reimburse a claimant only for the loss suffered by reason of its injury. Torsch v. McLeod, 665 So.2d 934,940 (Ala. 1995). The jury's award of $425,309 (excluding prejudgment interest) in compensatory damages on Allied's tort claims when it incurred an actual loss ranging from $64,467 (according to the testimony of Edwards's accountant) to $80,000 (according to the testimony of Allied's representative) was a windfall to Allied that is unsupported by the evidence of economic loss or the law.
In summary, the trial court erred when it prohibited Edwards's counsel from arguing to the jury that Allied's interest in the converted checks was less than the face amount of those checks. Because of that ruling, the jury's award of $513,972 ($425,309 plus prejudgment interest) was in error. We reverse the judgment on Allied's tort claims insofar as it awarded $513,972 in damages and order a new trial on the issue of compensatory damages for those claims.[14]
 2. Allied's Breach-of-Contract and Fiduciary-Duty Claims
The trial court entered a JML for Allied on its claims of breach of contract and breach of fiduciary duty. Edwards requests a new trial on both of those claims. This Court reviews de novo the grant or denial of a motion for a JML, determining whether there was substantial evidence, when viewed in the light most favorable to the nonmoving party, to produce a factual conflict warranting jury consideration. Alfa LifeIns. Corp. v. Jackson, 906 So.2d 143, 149 (Ala. 2005) (citing Ex parte Helms, 873 So.2d 1139, 1143-14
(Ala. 2003)). "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life AssuranceCo. of Florida, 547 So.2d 870, 871 (Ala. 1989).
The evidence supporting the JML for Allied on its breach-of-contract and breach-of-fiduciary-duty claims is largely uncontested.[15] Edwards was obligated under paragraph 2.8 of the agreement to send the corporate office all checks payable to Allied that were generated from closings and to hold all such moneys "in trust" for Allied. Her retention of checks, failure to report loan closings, direct payment of branch-operating expenses, and opening of a bank account in Allied's name were clear violations of the agreement.
Edwards's defense to Allied's breach-of-contract and breach-of-fiduciary-duty claims was that Allied breached first, and it therefore could not afterwards enforce the agreement against Edwards.[16] See Gray v. Reynolds,553 So.2d 79, 82 (Ala. 1989) (a court should not enforce a contract when the party seeking enforcement failed to perform his part of the agreement). Stated differently, Edwards *Page 207 
argues that Allied's breach excused her own nonperformance.See Nationwide Mut. Ins. Co. v. Clay, 525 So.2d 1339,1343 (Ala. 1987) ("a substantial breach by one party [to a contract] excuses further performance by the other").
The trial court rejected Edwards's defense. Even assuming that Allied breached the agreement beginning in the late 1990s, the trial court concluded that, at that time, Edwards must have either (a) repudiated the agreement and sued for Allied's breach, or (b) continued the agreement but waived any claim against Allied for its purported breach. Edwards did not repudiate the agreement when Allied purportedly breached. Ruling that Edwards had waived her right to sue Allied for its breach by not repudiating the agreement, the trial court determined that Edwards had no defense to Allied's claims alleging breach of contract and breach of fiduciary duty. Absent that defense, the trial court entered a JML on Allied's breach-of-contract claim and submitted the related question of compensatory damages to the jury. As damages for Allied's breach-of-contract claim, the jury awarded $308,369 for litigation expenses incurred by Allied.[17]
The Restatement (Second) of Contracts discusses two separate questions that arise if one party breaches its obligations under a contract in which the parties have promised to exchange performances. The first is whether the injuredparty is excused from performing his duties following the breach. If the defaulting party materially breaches its duties, the injured party may repudiate the agreement and not perform prospectively. See Restatement (Second) of Contracts, Ch. 10, intro. n. (1981) (the injured party is justified in not performing his own obligations if the other party materially fails to perform); Smith v. Clark, 341 So.2d 720, 721
(Ala. 1977) (court did not enforce boundary-line agreement against the plaintiff where the defendant failed to honor his part of that agreement to move a structure off the disputed area). In lieu of repudiation following a material breach by the other party, the injured party may elect to continue the contract and retain its economic benefits. SeeRestatement § 246, cmt. c, illus. 3.
The second question is whether the injured party may claimdamages for the breach. Contrary to the trial court's ruling, the injured party is not required to repudiate the contract in order to preserve its right to sue the other for breach of the contract. See Restatement, Ch. 10, intro. n. (parties ordinarily desire and bargain for performance by the defaulting party rather than a lawsuit). After a breach the injured party may elect to continue the agreement and claim damages from the defaulting party for his nonperformance. See Restatement § 246, cmt. b (injured party's acceptance of defective performance from the defaulting party does not preclude recovery of damages for the breach). When the parties have exchanged promises of performances, however, the injured party is not excused from performing his remaining duties if he continues the agreement with knowledge of the default by the breaching party. "`A plaintiff cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions.'"Southern Energy Homes, Inc. v. Gregor, 777 So.2d 79,82 (Ala. 2000) (quoting Southern Energy Homes, Inc. v.Ard, 772 So.2d 1131, 1134 (Ala. 2000)). As stated in § 246 of the Restatement, "an obligor's acceptance or his retention for an unreasonable time of *Page 208 
the obligee's performance, with knowledge or reason to know of the [obligee's failure to perform], operates as a promise to perform in spite of that non-occurrence. . . ."
Edwards continued the agreement and received its financial benefits for approximately four years after she learned of Allied's purported nonperformance. Having made that election, Edwards was not excused from performing her own obligations under the agreement. See Restatement § 246. The evidence is undisputed that, following Allied's purported breach, Edwards did not send all closing checks to Allied, failed to hold Allied's funds "in trust," opened a bank account in Allied's name, and directly paid branch-operating expenses from her d/b/a account. Edwards's argument that Allied "breached first" did not excuse her nonperformance where, as here, she accepted the benefits of the agreement with knowledge of Allied's alleged breach.[18] Accordingly, the trial court did not err when it entered a JML in favor of Allied on its breach-of-contract and breach-of-fiduciary-duty claims. Further, the judgment awarding Allied $308,369 in compensatory damages on its breach-of-contract claim is affirmed.
 3. Edwards's Breach-of-Contract Counterclaim
Edwards presented testimony concerning two categories of revenues she alleged Allied owed her. First, Edwards's accountant testified that, over the life of the agreement, Allied underpaid Edwards approximately $215,000 (excluding interest) on transactions that were reported, processed, and accounting entries made using Allied's administrative procedures for the agreement ("the accounting errors"). Edwards's accountant calculated this $215,000 by comparing settlement statements and other records related to loan closings that Edwards reported with records of payments she received from Allied.
Second, Edwards also proffered evidence indicating that Allied retained the branch-account closing balance (i.e., $125,300). Immediately after Allied sued Edwards, the trial court issued a temporary restraining order directing Edwards to deliver to Allied all the checks on hand. Edwards complied with that directive and surrendered checks totaling approximately $141,000. After Allied deposited those checks and made entries in the branch account, the closing balance in that account was $125,300.[19]
Allied argues that we should affirm the trial court's judgment against Edwards on her breach-of-contract counterclaim for two reasons. First, Allied contends, Edwards failed to present substantial evidence indicating that she did not waive Allied's purported breach.[20] Waiver is the intentional relinquishment of a known right. O'Neal v. O'Neal,284 Ala. 661, 663, 227 So.2d 430, 431 (1969). "[I]ntentional relinquishment must be shown in an unequivocal manner."Putman Constr. Realty Co. v. Byrd,632 So.2d 961, 965 *Page 209 
(Ala. 1992). A party's intent to waive a right may be found from conduct that is inconsistent with the assertion of that right.Givens v. General Motors Acceptance Corp.,56 Ala.App. 561, 324 So.2d 277, 279 (1975).
Allied argues that Edwards waived her breach-of-contract counterclaim by accepting the benefits of the agreement after she learned of Allied's purported breach. Allied notes that, as late as 2002, Edwards acknowledged that the agreement was still effective. Allied also proved that Edwards did not possess any documents (whether in paper or electronic form) concerning her complaints about Allied's alleged nonperformance under the agreement. Based on these facts, Allied posits that a reasonable juror could only find from Edwards's conduct that she waived her breach-of-contract counterclaim against Allied.
Whether a party has intentionally waived a known right is normally a jury question. See Putman Construction,632 So.2d at 965. Although Allied presented considerable evidence on its waiver defense, we view the evidence in the light most favorable to Edwards when reviewing the JML entered against her. Edwards testified that, during the term of the agreement, she orally complained on dozens of occasions to different representatives of Allied about its mismanagement of the branch account. According to Edwards, those complaints concerned delays in paying (or failure to pay) branch-operating expenses, erroneous accounting entries, failure to remit commissions, and failure to furnish a written accounting after she made multiple requests. Although Allied proved the absence of documentary evidence concerning these oral complaints, it did not present any witness to rebut Edwards's testimony that she had indeed made them.
Under these facts, Edwards presented substantial evidence to rebut Allied's defense that she had waived Allied's breach of the agreement. Because a jury question existed as to whether Edwards intentionally relinquished her breach-of-contract counterclaim, Allied was not entitled to a JML on the basis of its waiver defense.
In the alternative, Allied argues that the faithless-servant doctrine should bar Edwards's claim for additional compensation from Allied under the agreement. After Edwards rested her case, the trial court invoked that doctrine and ruled that Edwards had forfeited any right to recover the $141,000 in checks on hand that funded the branch-account closing balance. We apply a de novo standard in reviewing that conclusion of law. BTSec. Corp., 891 So.2d at 312.
The faithless-servant doctrine precludes an employee from receiving compensation for conduct that is disloyal to the employer or in violation of the employee's employment contract. The Restatement (Second) of the Law of Agency § 469 (1958) describes the doctrine:
 "An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned."
(Emphasis supplied.)
This longstanding doctrine remains effective today. It was first recognized in McGar v. Adams, 65 Ala. 106
(1880). In that case, an agent had been employed to find a purchaser for property belonging to his principal. The agent, who was to receive a commission upon the sale of that property, located a purchaser to whom the *Page 210 
principal transferred the property. Before that transaction closed and unbeknownst to the principal, however, the purchaser asked the agent — a banker — for a loan to fund the purchase. In lieu of making that loan, the agent and purchaser entered into an agreement pursuant to which the agent could buy a one-half interest in the property. The purchaser conveyed that one-half interest to the agent and split the sales commission the principal had paid the agent. After learning of the agent's actions, the principal sued the agent to recover the commission. Considering these facts, the McGar
Court stated:
 "An agent who, for a reward, is employed in the transaction of business, will justly forfeit all right to compensation if he is guilty of bad faith to the principal. . . ."
65 Ala. at 109.
The "bad faith" principle in McGar was reaffirmed inDudley v. Colonial Lumber Co., 223 Ala. 533,137 So. 429 (1931):
 "It is unquestionably the law that it is the duty of an agent to act in matters touching the agency, with due regard to the interest of the principal. In accepting the agency he impliedly undertakes to give his principal his best care and judgment, and to use the powers conferred upon him for the sole benefit of his principal consistent with the purposes of the agency. . . .
 "And `an agent who, for a reward, is employed in the transaction of business, will justly forfeit all right to compensation, if he is guilty of bad faith to the principal.'. . ."
223 Ala. at 536, 137 So. at 431.[21]
As noted above, the trial court applied the faithless-servant doctrine when it ruled that Edwards could not claim the $141,000 in checks on hand she delivered to Allied after the agreement was terminated. Allied argues that Edwards's conduct in concealing many loan closings and retaining closing checks is the "bad faith toward the principal" on which the doctrine is based. Because of that deceitful conduct, Allied argues, Edwards should forfeit all rights to the $141,000 of checks on hand or any other compensation from Allied.
The facts support the application of the faithless-servant doctrine in this case. In the late 1990s, Edwards began depositing checks payable to Allied into her personal accounts. Even though Allied had an interest in those funds, Edwards did not calculate, deduct from the funds, and send Allied its corporate fee from the associated loan closings that generated those checks. Further, she did not disclose numerous loan closings that she helped close through the Huntsville branch office and did not forward to Allied records of those transactions. Edwards defends her conduct on the basis that that Allied did not perform its obligations under the agreement. Edwards's self-help accounting practices were unjustified, however, because she had a duty as an employee to disclose loan closings, the checks, and the related transactions to Allied. Moreover, *Page 211 
even if Allied's management of the branch account was deficient, Edwards was not justified in concealing those transactions. The inefficient conduct of business by an employer does not excuse an employee's breach of duties of loyalty and fidelity to his employer.[22]
Despite the soundness of the faithless-servant doctrine and the substantial evidence of Edwards's unfaithful conduct, that doctrine does not preclude all of Edwards's claims for compensation in this case. Allied agreed to pay commissions to Edwards if she was terminated "for any reason." Paragraph 3.4 of the agreement states:
 "3.4 Upon termination of employment, for any reason, Employee shall be paid, less any repayable advances or other monies owed to Employer, for all loans actively solicited, originated, and processed by Employee which are approved prior to the Employee's termination date if and only if actually funded within thirty (30) days of termination. With regard to such loans at time of termination, Employee will be paid a commission of one-half (0.50%) percent of the loan amount only if the loan is actually funded within thirty (30) days. Said payment to Employee [is] to be paid only after any funds that may be owed by Employee to Employer are paid by Employee to Employer or at Employer's option, after the deduction by Employer of any such amounts still due the Employer by Employee. Employer may deduct such amounts from any payment due to Employee which payments shall be made as soon as Employer can reasonably reconcile the accounts of Employer and Employee."
(Emphasis supplied.)
Only in limited circumstances will this Court not enforce an agreement willingly entered into by contracting parties. This Court discussed this principle in Ex parte Thicklin,824 So.2d 723, 732 (Ala. 2002):
 "This Court has limited authority to deal with the enforceability of contract terms. It can nullify or reform a contract on the basis of fraud; it can also nullify or reform a contract to eliminate any unconscionable provisions or terms that violate public policy. As previously noted, a contract provision that violates public policy can be subsumed under the theory of substantive unconscionability. . . . However, § 43 of the Constitution of Alabama of 1901 mandates the separation of judicial power from legislative power and condemns the usurpation of the power of one branch of government by the other. The authority to declare public policy is reserved to the Legislature, subject to limits imposed by the Constitution. . . ."
(Footnote omitted.)
The agreement here, which was bargained for at arm's length between persons who were experienced in the mortgage-loan business, is not unconscionable. Allied certainly was free not to insert language in its agreement that allowed the payment of commissions to Edwards even in the event of her faithless service. Instead, Allied agreed to pay Edwards commissions upon her being terminated "for any reason" (which includes faithless service), *Page 212 
and we are duty bound to enforce the plain meaning of paragraph 3.4.
Because Allied agreed to pay Edwards commissions if she was terminated for any reason, and in light of our discussion above on Allied's waiver defense, we reverse the JML entered against Edwards on her breach-of-contract counterclaim and order that a new trial be held on her breach-of-contract counterclaim. Subject to the jury's resolution of Allied's waiver defense and its other defenses, on retrial Edwards may assert any claims for commissions that are covered under paragraph 3.4 of the agreement.[23]
 4. Other Alleged Errors by Trial Court
The jury returned a verdict for Allied on Edwards's claims of conversion and trespass that arose from the events that occurred on August 13, 2003. On that date, Allied's representatives entered the Huntsville branch office, retrieved Allied's business records, and allegedly converted items of personal property owned by Edwards. Edwards argues that the trial court committed two errors that warrant a new trial on these claims.
 a. Evidentiary Rulings on Amended Tax Returns
The commissions Allied paid Edwards from the branch account constituted income to her for federal income tax purposes. Also, branch-operating expenses were deductible as ordinary business expenses on Edwards's tax returns. Edwards did not, however, initially report income or claim expense deductions on her tax returns with respect to the transactions she did not disclose to Allied. After Allied sued in 2003, Edwards amended her tax returns for the prior years to recognize those transactions.
For impeachment purposes, the trial court allowed Allied to cross-examine Edwards concerning the timing and filing of her amended returns. Those returns were also admitted into evidence. Edwards objected to those evidentiary rulings on the basis that they allowed Allied to impugn Edwards's credibility in violation of Rule 608(b), Ala. R. Evid. Rule 608(b) provides:
 "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than conviction of crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence."
Edwards argues that Rule 608(b) proscribes cross-examination concerning "`specific acts of misconduct by [a witness] which have no relevancy except as tending to show that [the witness] is a person of bad character as a whole or with respect to truth and veracity.'" J.B. Hunt Transport, Inc. v.Credeur, 681 So.2d 1355, 1361 (Ala. 1996) (quoting C. Gamble, McElroy's Alabama Evidence § 140(10) (4th ed.1991)). Edwards contends that the inquiry into her amended tax returns was error because, she argues, those returns were immaterial to the issues in the case. Allied argues that the impeachment of Edwards concerning her amended returns and tax-reporting practices was valid after she testified that Allied's nonperformance of its *Page 213 
obligations under the agreement had prevented Edwards from "making a living."
A trial court has "wide discretion in matters of cross-examination." Hyche v. Medical Ctr. East, Inc.,711 So.2d 1017, 1019 (Ala.Civ.App. 1997). Rulings on those matters "will not be reversed absent a showing of gross abuse of that discretion that caused substantial injury to the objecting party." 711 So.2d at 1019. Furthermore, a judgment will not be reversed for the "improper admission or rejection of evidence . . . unless in the opinion of the court to which the appeal is taken . . . after an examination of the entire cause, it [appears] that the error complained of has probably injuriously affected substantial rights of the parties." Rule 45, Ala. R.App. P. Without deciding whether the trial court exceeded its discretion in allowing cross-examination based on the amended tax returns, Edwards has not demonstrated the requisite substantial injury required for a reversal of the trial court's judgment based on Rule 45.
 b. Closing Argument About Witness not Called by Allied
Without advance notice to Edwards, representatives of Allied came to the Huntsville branch office on August 13, 2003 — the date the agreement was terminated — to retrieve Allied's records. Cheryl Camp, an employee of the Huntsville branch office, testified that Jim Hodge, Allied's president, who was based in Houston, Texas, threatened in a telephone conversation held on that day "to tie her up in litigation for life" if she did not cooperate with Allied's representatives. During closing argument, Edwards's counsel attempted to argue to the jury the significance of Allied's failure to call Hodge as a witness. Allied objected to that argument on the grounds that Edwards could have deposed Hodge before trial and that he was "equally accessible" to either party. The trial court sustained that objection, prohibited Edwards's argument, and stated the following to Edwards's counsel in the presence of the jury:
 "The Court: You can subpoena [Mr. Hodge] or take his deposition, Mr. Ogle. That is improper argument and the Court hereby instructs you not to make that argument, and the jury will ignore it."
Edwards moved for a mistrial following that exchange. The trial court denied that motion. On appeal, Edwards argues that the trial court erred when it prohibited her argument about Hodge's failure to testify. Further, Edwards argues that the trial court's "castigation" of her counsel in the presence of the jury caused her such substantial injury that a new trial is warranted on her tort claims.
The standard of review is whether the trial court exceeded its discretion in prohibiting part of Edwards's closing argument and denying her related motion for a mistrial. Super ValuStores, Inc. v. Peterson, 506 So.2d 317, 325 (Ala. 1987). A court exceeds its discretion when its ruling is based on an erroneous conclusion of law or when it has acted arbitrarily without employing conscientious judgment, has exceeded the bounds of reason in view of all circumstances, or has so far ignored recognized principles of law or practice as to cause substantial injustice. Hale v. Larry Latham Auctioneers,Inc., 607 So.2d 154, 155 (Ala. 1992); Dowdy v. GilbertEng'g Co., 372 So.2d 11, 13, (Ala. 1979).
A party may not comment on the failure of his opponent to call a witness if that witness is "equally accessible" to both parties. Donaldson v. Buck, 333 So.2d 786, 787
(Ala. 1976). The fact that either party can subpoena a potential witness does not automatically make that witness equally accessible. 333 So.2d at 788. *Page 214 
When the testimony of the witness would favor one party over the other, the witness is not "equally accessible." See,e.g., Harrison v. Woodley Square Apartments, Ltd.,421 So.2d 101, 103 (Ala. 1982) (testimony of friend of plaintiff's likely would favor plaintiff); Drs. Lane, Bryant, Eubanks Dulaney v. Otts, 412 So.2d 254 (Ala. 1982) (potential witness who was a physician was not equally accessible when his testimony likely would favor the defendant physicians).
Here, Hodge — Allied's president — was not equally accessible to Edwards. Notwithstanding, Allied argues that the trial court did not commit error when it precluded Edwards's argument unless the "noncalled person had knowledge of a material matter and is hostile to or biased against the party offering the comment." C. Gamble, McElroy's AlabamaEvidence § 191.04(b) (5th ed.1995).
According to Edwards's testimony, she had numerous telephone conversations with, and left multiple messages for, Hodge about administrative problems related to the agreement that she had experienced during its term. However, the breach-of-contract claims were not in dispute at the time of Edwards's closing argument, and the scope of that argument was limited to rebuttal comments concerning her claims of trespass and conversion, which were then pending. Although Hodge was not equally accessible to Edwards, she has not demonstrated that Hodge had knowledge of matters that were material to thosetort claims. Absent that showing, Edwards's closing argument regarding Hodge's failure to testify was unwarranted.[24]
In summary, the trial court did not cause substantial injury to Edwards in its evidentiary rulings related to her amended tax returns. Additionally, the trial court did not commit error when it prohibited Edwards's counsel from referring in closing argument to Hodge's failure to testify or when it discussed that ruling with Edwards's counsel before the jury. Accordingly, the judgment for Allied on Edwards's tort claims is affirmed.
 Conclusion
We affirm the judgment in favor of Allied to the extent that it found Edwards liable on Allied's claims of breach of contract and breach of fiduciary duty. We also affirm that portion of the judgment for Allied that awarded it $308,369 as compensatory damages on its breach-of-contract claim.
We reverse the judgment in favor of Allied insofar as it awarded $513,972 in damages on its claims against Edwards alleging conversion, fraudulent suppression, and breach of fiduciary duty; we remand the case for the trial court to *Page 215 
conduct a new trial to reconsider the amount of compensatory damages recoverable by Allied on those tort claims.
We affirm the judgment entered against Edwards on her claims alleging trespass and conversion. We reverse the trial court's judgment on Edwards's counterclaim alleging breach of contract and remand the case for the trial court to conduct a new trial on that counterclaim.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
SEE, HARWOOD, STUART, and BOLIN, JJ., concur.
[1] Loans were funded either by Allied or by lenders it approved. During the period pertinent to these disputes, most loans that closed with assistance from Allied's branch in Huntsville were funded by lenders other than Allied.
[2] If Edwards retained a third party (e.g., an appraiser or credit-report agency) to perform any closing services, the closing attorney would deduct from the loan proceeds and remit to the branch the amount Edwards owed that third party. In the ordinary course of business, Allied, not Edwards, was responsible to remit payment to the third-party vendors.
[3] Allied did not maintain separate accounts for Edwards's Huntsville branch office or for any of its other branches. Beginning in 1999, Allied accounted for branch revenues, payments of branch-operating expenses, and deductions of corporate fees in Moneylink, an on-line software program.
[4] In pertinent part, paragraph 4.1 of the agreement staled: "All files, records, documents, drawings, . . . proprietary information, and similar items relating to the business of [Allied], whether prepared by [Edwards] or otherwise coming into [Edwards's] possession, shall remain the exclusive property of [Allied] and shall not be copied or removed from the premises of [Allied] under any circumstances whatsoever without the prior written consent of [Allied]."
[5] Allied also asserted claims against Edwards alleging negligence, wantonness, money had and received, and unjust enrichment. Those claims were dismissed before the jury was charged at trial.
[6] On August 13, 2003, Edwards was renting the branch office space from a third party under an oral, month-to-month lease.
[7] Paragraph 2.13 of the agreement stated that "[Edwards] shall indemnify and hold [Allied] . . . harmless from and against any and all claims, losses, damages, fines, penalties, causes of action, suits, and liability of every kind, including all expenses of litigation, court costs and attorney fees arising on account of . . . (2) an violation of this Agreement. . . ." The agreement did not state that Edwards could recover her attorney fees or other litigation costs if Allied breached its obligations thereunder.
[8] As discussed below, the evidence presented by Edwards at trial on her counterclaim related to Allied's alleged underpayment of the principal sum of $215,000 and its retention of the branch-account closing balance (i.e., $125,300).
[9] Allied's proof of damage on its breach-of-contract claim was limited to attorney fees and litigation expenses.
[10] The trial court told Edwards's counsel that, if he argued that Allied's interests in the checks retained by Edwards was less than their face value or that Edwards had paid branch-operating expenses from the funds she converted, it would give a correcting instruction and affirmatively charge the jury that Allied was entitled to the face amount of the checks.
[11] Edwards did not attempt to appeal the trial court's finding of liability on Allied's claims of conversion and fraudulent suppression, and that finding is not an issue on appeal.
[12] The damages flowing from Edwards's conversion of checks were common to all of Allied's tort claims. The trial court instructed the jury that Allied did not claim any damages for fraudulent suppression and breach of fiduciary duty over those claimed for conversion.
[13] Black's Law Dictionary 1224 (8th ed.2004) defines a "rebuttable presumption" as "[a]n inference drawn from certain facts that establish a prima facie case, which may be overcome by the introduction of contrary evidence."
[14] In view of our holding, we need not consider Edwards's alternative argument that she should have been allowed to argue to the jury that the damages of $425,309 should be mitigated by the sum of branch-operating expenses she paid directly and by the branch-account closing balance.
[15] It was undisputed that Allied had an interest in the vast preponderance of checks that Edwards converted. Edwards contended that Allied did not own several checks that totaled $346. The jury disagreed and included those checks in the amount it awarded as compensatory damages on the tort claims.
[16] Edwards primarily claims that Allied breached by making accounting errors in managing the branch account.
[17] Edwards does not contest the jury's calculation of those damages, but instead contends that a new trial should be awarded on Allied's underlying contract theory.
[18] If parties promise to exchange performances, the determination as to which party first committed a material breach is critical in deciding whether, upon the defaulting party's failure to cure its breach, the other party is excused from performing his remaining obligations. SeeRestatement § 237, cmt. b.
[19] There was approximately $17,000 in the branch account when Allied terminated the agreement. After Allied deposited the $141,000, it apparently removed its corporate fee or debited other sums from the branch account.
[20] Even though the trial court incorrectly ruled that Edwards waived her breach-of-contract claim by not repudiating the agreement, we could affirm the judgment for Allied on that claim for any valid ground. See Brannan v. Smith,784 So.2d 293, 297 (Ala. 2000).
[21] Another case in which the doctrine was thoroughly considered is Bessman v. Bessman, 214 Kan. 510,520 P.2d 1210 (1974). The employee in Bessman received a weekly salary to manage a hotel-renovation project. The employee kept payments from contractors who were working on the project and failed to report those transactions to his employer. The employee defended his retention of the undisclosed payments "as a form of self-help, justified by the employer's slow pay of his salary." 214 Kan. at 513,520 P.2d at 1213. The Bessman Court applied the faithless-servant doctrine and held that the employee was not entitled to his salary during the 48-week "period of his unfaithlessness." 214 Kan. at 513, 520 P.2d at 1220.
[22] In Dudley v. Colonial Lumber Co., supra, this Court rejected the agent's argument that because of the principal's errors in filling orders the agent was justified in keeping certain sales commissions that were otherwise payable to the principal. The Dudley Court stated that it was the agent's duty to advise the principal of its errors.223 Ala. at 536, 137 So. at 431.
[23] The trial's court's rulings on Edwards's counterclaim precluded full development of her breach-of-contract theories. Paragraph 3.4 states that Edwards was to receive a .50% commission on certain loans funded within 30 days of her termination. It is not clear from the record how that or other provisions in 3.4 apply to the categories of moneys in dispute. Provided Edwards can prove that, pursuant to paragraph 3.4, the parties intended she would be paid the branch-account closing balance of $125,300 and the approximate $215,000 in purported accounting errors upon her termination, she may claim those moneys as damages on retrial.
[24] We also disagree with Edwards's contention that the manner in which the trial court prohibited Edwards's closing argument regarding Hodge's failure to testify brought her counsel "into contempt before the jury," caused her prejudicial injury, and warrants reversal. Gwin v. State,425 So.2d 500, 507 (1982) (a trial judge should not express any opinion, use language, or engage in other conduct that brings an attorney into contempt). When the trial court prohibited that argument, the above-noted exchange ensued in which counsel debated the propriety of that ruling in the presence of the jury. That exchange would not have occurred had Edwards's counsel approached the bench and requested a sidebar conference. Even if the trial court erred when it limited closing argument, which it did not, Edwards's counsel invited any error that arose from the exchange before the jury.See, e.g., Phillips v. Anesthesia Servs., P.C.,565 So.2d 127, 129 (Ala. 1990) (a party may not avail himself of an error into which he led the trial court). The manner in which the trial court limited Edwards's closing argument cannot be said to be reversible error.