ROBERTS, J., for the Court.
 

 ¶ 1. Tyronne Lekeith Wade was found guilty of possession of more than one kilogram of marijuana with the intent to transfer or distribute. The Harrison County Circuit Court sentenced Wade to twenty years in the custody of the Mississippi Department of Corrections (MDOC) with ten years to serve and five years of “supervised” post-release supervision followed by five years of “unsupervised” post-release supervision. Wade appeals and claims the circuit court erred when it denied his pretrial motion to suppress the evidence against him. Wade claims the circuit court should have suppressed the evidence against him because he was illegally detained during a traffic stop. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On the morning of November 13, 2006, Wade was driving a rental car through Harrison County, Mississippi. The rental car did not have a traditional metal license plate displayed in the commonly-accepted location. Instead, there was a paper Alabama license displayed in the rear window. Deputy William Sense-ney with the Harrison County Sheriffs Department did not see the paper Alabama license in the rear window of Wade’s rental car, because it was displayed from the inside of the heavily-tinted rear window of the rental car and the window was covered by a layer of dirt and dust. Because Deputy Senseney did not see any license plate when he encountered Wade, he pulled Wade over at approximately 10:13 a.m.
 

 ¶ 3. As Deputy Senseney approached Wade’s rental car, Deputy Senseney noticed the Alabama paper license in the rear window of the car. Deputy Senseney then went to the passenger side of Wade’s rental car and asked Wade for his driver’s license and his proof of insurance. Wade presented his North Carolina driver’s license and informed Deputy Senseney that the rental car was insured through the rental agreement.
 

 ¶ 4. Deputy Senseney noticed that Wade appeared nervous. According to Deputy Senseney, Wade’s hands were shaking when he provided his driver’s license and the rental agreement. Deputy Senseney asked Wade “where he was coming from.” Deputy Senseney reported that Wade told him “that he was just coming from seeing his uncle who was dying of cancer in Beaumont, Texas.” However, Deputy Sense-ney later repeated his question to Wade. Wade’s later response indicated that he could not remember what he had said to Deputy Senseney. According to Deputy Senseney, Wade “hesitated for a while, and he then said [’jwhere did I tell you I was coming from?[’]” Deputy Senseney responded,
 
 “1
 
 don’t know ... [yjou tell me.” Wade then said, “well, you know where I was coming from.” Deputy Sense-ney then asked Wade how his uncle was doing. As mentioned, Wade first told Deputy Senseney that his uncle was dying. However, when asked about his uncle a second time, Wade replied, “[o]h,
 
 he’s fine.
 
 I just went out there to visit him.”
 

 ¶ 5. According to Deputy Senseney, the placement of certain items in Wade’s rental car further aroused his suspicions. Deputy Senseney smelled an unusually strong odor of air fresheners from the car, and he noticed that there were large air fresheners attached to each of the rental car’s air conditioning vents. Wade had a
 
 *501
 
 small Bible in the open console of the rental car, and he had hung a set of rosary beads from the dashboard. Additionally, Wade had hung a set of military identification tags, commonly referred to as “dog tags,” from the rear-view mirror. Deputy Senseney articulated that, under the totality of the circumstances, he became suspicious that the air fresheners could be intended to mask the smell of narcotics, and the religious and military articles could be intended to convey a message that Wade was a “good person” who would not warrant further attention.
 

 ¶ 6. Deputy Senseney asked Wade to join him in his patrol car while he wrote out what he described as a “courtesy citation” for what he characterized as Wade’s “improperly displayed tag.” Wade complied and sat in the front passenger seat of the patrol car. Meanwhile, Deputy Sense-ney “noticed that ... [Wade’s] breathing seemed to be heavier than what [he] would think would be a normal person’s breathing patterns, and he continued to fidget with the leg on his pants and just ... appeared to be nervous.”
 

 ¶ 7. Deputy Senseney requested a criminal background check on Wade. While they waited, Deputy Senseney reviewed Wade’s rental agreement. Deputy Senseney noticed what he considered to be another inconsistency in Wade’s story. Although Wade told Deputy Senseney that he was coming from Beaumont, Texas, the rental agreement reflected that Wade had rented the car in Harlingen, Texas. According to Deputy Senseney, “Beaumont is basically on one side of Texas; Harlingen is down on the opposite end of Texas down by the border in the valley area.” When the criminal background check on Wade was completed, Deputy Senseney discovered that Wade “had several ... prior drug-related arrests, with the latest one being in June of [20]06 in Louisiana.” However, there were no outstanding warrants for Wade’s arrest.
 

 ¶ 8. Deputy Senseney filled out a consent-to-search form and explained that, if Wade signed it, he would allow Deputy Senseney to search the car. Deputy Senseney also explained that Wade had the right to refuse to consent to a search of his car. Wade refused to sign the form and refused to consent to a search of his rental car. However, after Wade refused to consent to a search of his rental car, Deputy Senseney requested that an officer with a drug-detecting dog report to the scene of the traffic stop. According to Deputy Senseney, he made that request at 10:27 a.m.
 

 ¶ 9. The record refleets that Deputy Timothy Huguet arrived at the scene of the traffic stop in just three minutes. Deputy Senseney testified that when Wade realized that Deputy Huguet was walking around his rental car with a dog, Wade “hopped out of the [patrol] car and ... started hollering [’]whoa, you’ve got to stop, you’ve got to stop[’] and all this stuff.” Despite protesting the dog’s presence, Wade did not interfere with Deputy Huguet as he walked around the rental car with the dog.
 

 ¶ 10. Deputy Huguet’s dog “alerted” at the right and left rear quarterpanels of the rental ear and indicated that it had smelled narcotics in the rental car. Deputy Sense-ney and Deputy Huguet then searched Wade’s rental car. They found approximately sixty pounds of what they suspected to be bundled and packaged marijuana concealed within three suitcases: two in the back cargo area of the rental car, and one on the passenger side of the back seat.
 

 ¶ 11. Wade was arrested at the scene. On June 11, 2007, he was indicted and charged with possession of more than one kilogram of marijuana with the intent to transfer or distribute. Wade pled not
 
 *502
 
 guilty. On March 26, 2008, Wade filed a motion to suppress the marijuana and dismiss the indictment against him. According to Wade, Deputy Senseney unlawfully detained him until Deputy Huguet could respond with his dog.
 

 ¶ 12. On April 1, 2008, the circuit court conducted a hearing on Wade’s motion to suppress the evidence against him. Deputy Senseney and Deputy Huguet testified during that hearing. After each side presented its argument, the circuit court announced that it would take Wade’s motion under advisement. The circuit court allowed Wade and the prosecution to submit letter briefs on the issue of whether the evidence against Wade should be suppressed. Each side submitted a letter brief. On April 23, 2008, the circuit court denied Wade’s motion to suppress the evidence against him.
 

 ¶ 13. On May 1, 2008, Wade went to trial. Wade waived his right to a jury trial and chose to have a bench trial. Deputies Senseney and Huguet testified during the trial. Agent Ian Estorffe of the Mississippi Bureau of Narcotics also testified for the prosecution. Agent Estorffe testified that he took custody of the packaged substance suspected to be marijuana and transported it to the Mississippi Crime Laboratory. According to Agent Estorffe, the bundles actually contained sixty-six pounds, 29,937 grams, of marijuana.
 
 [1]
 

 ¶ 14. The prosecution rested its case-in-chief after Agent Estorffe testified. Wade did not testify. He rested without calling any witnesses or presenting any evidence. The circuit court did not render a verdict at the end of the trial. Instead, the circuit court took the matter under advisement. On May 27, 2008, the circuit court entered its judgment finding Wade guilty. The circuit court sentenced Wade to twenty years in the custody of the MDOC. The circuit court suspended ten years of Wade’s sentence with ten years to serve followed by five years of post-release supervision.
 

 ¶ 15. Wade filed a motion for reconsideration. Wade’s attorney stated that he “was, perhaps mistakenly, under the impression [that] the [e]ourt had previously] stated a willingness to defer sentencing for a period of time to allow [Wade’s] family to be present and to address the [c]ourt” prior to sentencing Wade. On June 23, 2008, the circuit court conducted a hearing and allowed Wade’s attorney, Wade’s mother, and Wade’s aunt to address the circuit court judge and request that he be lenient in sentencing Wade. Afterward, the circuit court amended its previous sentence. The circuit court stated that “under state law, I’m not allowed to suspend any part of a sentence.”
 
 [2]
 
 Accordingly, the
 
 *503
 
 circuit court sentenced Wade to twenty years in the custody of the MDOC with ten years to serve followed by five years of “supervised” or “reporting” post-release supervision and then five years of “unsupervised” or “non-reporting” post-release supervision.
 
 [3]
 

 ¶ 16. Wade appeals. He raises one issue on appeal. According to Wade, the circuit court erred when it denied his motion to suppress the marijuana.
 

 STANDARD OF REVIEW
 

 ¶ 17. “The standard of review regarding the admission or exclusion of evidence is abuse of discretion.”
 
 Lattimer v. State,
 
 962 So.2d 206, 215(¶ 24) (Miss.Ct.App.2006). “Abuse of discretion will only be found where a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense.”
 
 Id.
 

 ¶ 18. We further note that, as part of his overall argument, Wade claims that there were no “specific and articulable facts” from which a “reasonable suspicion” of a traffic offense or other crime could be gleaned to support and justify Deputy Senseney’s traffic stop. The Mississippi Supreme Court has clarified the appropriate standard of review in the event of such arguments, stating that:
 

 The principal components of a determination of [whether there was] reasonable suspicion or probable cause [justifying a traffic stop] will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause.
 

 Gonzalez v. State,
 
 963 So.2d 1138, 1141(¶ 10) (Miss.2007) (quoting
 
 Ornelas v. United States,
 
 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). “[T]he ‘first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact.’ ”
 
 Id.
 
 “Thus, historical facts are reviewed only for clear error, while determinations of reasonable suspicion are reviewed de novo.”
 
 Id.
 
 (quoting
 
 Ornelas,
 
 517 U.S. at 699, 116 S.Ct. 1657) (footnote omitted).
 

 ANALYSIS
 

 ¶ 19. Wade claims the circuit court erred when it denied his motion to suppress the evidence. According to Wade, Deputy Senseney had no legal right to stop him. Wade also claims Deputy Senseney had no right to detain him after Deputy Senseney determined that he had a valid temporary license plate.
 

 ¶ 20. The Fourth Amendment to the United States Constitution and Article 3 Section 23 of the Mississippi Constitution provide that an individual has the right to be free from unreasonable searches and seizures.
 
 Dies v. State,
 
 926 So.2d 910, 917-18(¶ 21) (Miss.2006). “Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose,
 
 *504
 
 constitutes a ‘seizure’ of ‘persons’ within the meaning of this provision.”
 
 Whren v. United States,
 
 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed2d 89 (1996) (citations omitted). Evidence, however relevant and trustworthy, obtained from an illegal arrest or detention is inadmissible at trial.
 
 Davis v. Mississippi,
 
 394 U.S. 721, 724, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). The Mississippi Supreme Court has held that:
 

 Unless the marijuana was discovered during a legal search, it may not be seized. If it was illegally seized, it may not be admitted into evidence. It is therefore important to examine the legality of the particular intrusions which enabled the police to see this marijuana to determine if these intrusions were outside the legitimate scope of the police’s authority.
 

 Gonzalez,
 
 963 So.2d at 1140(¶ 9) (quoting
 
 Carney v. State,
 
 525 So.2d 776, 785 (Miss.1988)).
 

 ¶ 21. There are several exceptions to the Fourth Amendment’s general prohibition of warrantless searches.
 
 Gonzalez,
 
 963 So.2d at 1141(¶ 12). The exception central to this case is the exception for non-custodial investigatory stops, also known as
 
 Teny
 
 stops.
 
 See Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). “The United States Supreme Court has noted that swift and necessary actions by officers ‘must be tested by the Fourth Amendment’s general proscription against unreasonable searches and seizures.’ ”
 
 Gonzalez,
 
 963 So.2d at 1141(¶ 13) (quoting
 
 Terry,
 
 392 U.S. at 20, 88 S.Ct. 1868). “To stop and temporarily detain is not an arrest, and the cases hold that given reasonable circumstances an officer may stop and detain a person to resolve an ambiguous situation without having sufficient knowledge to justify an arrest.”
 
 Id.
 
 (citation omitted). “[I]t is imperative that the facts be judged against [the following] objective standard: Would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?”
 
 Id.
 
 at 1141-42. (citations and internal quotations omitted).
 

 ¶ 22. There is a two-fold test to determine whether a law enforcement officer’s search and seizure were reasonable: “(1) whether the officer’s action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place.”
 
 Id.
 
 at 1142(¶ 14) (citation omitted). “[T]o satisfy the first prong, the law enforcement officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.”
 
 Id.
 
 (citation and internal quotations omitted).
 

 I. DEPUTY SENSENEY’S RIGHT TO STOP WADE
 

 ¶ 23. The facts in this case are strikingly similar to the underlying facts in
 
 Gonzalez.
 
 In
 
 Gonzalez,
 
 a Mississippi State Highway Patrol Trooper stopped a rental car because the trooper could not see a temporary license tag that was displayed from the inside of windows that were described as “very dark” and “very tinted.”
 
 Gonzalez,
 
 963 So.2d at 1142(¶ 16). The Mississippi Supreme Court noted that “vehicles operated on Mississippi’s highways must have tags ‘conspicuously displayed on the vehicle being operated in such a manner that it may be easily read.’ ”
 
 Id.
 
 at 1143(¶ 20) (quoting Miss. Code Ann. § 27-19-323 (Rev.2006)). The supreme court went on to hold that “[i]n light of this clear statutory language, it is not enough that the vehicle actually had a tag. If the tag was not ‘conspicuously displayed’ and ‘easily read,’ [the trooper] was fully justified in making the stop.”
 
 Id.
 

 
 *505
 
 ¶ 24. Deputy Senseney’s decision to stop Wade was not unreasonable. Deputy Senseney was not able to see Wade’s license plate because it was displayed inside the heavily-tinted rear "window of Wade’s rental car, and the tag was further obscured by a significant amount of dirt and dust. Having viewed the picture introduced in evidence that depicted Wade’s rental car and the visible conditions of the rear window, it was reasonable that Deputy Senseney could not see Wade’s tag. Even from a close viewpoint in daylight, it is impossible to determine that the rectangular object in the window is a valid temporary license tag.
 

 ¶ 25. Failure to conspicuously display a tag in such a manner that it may easily be read is an offense under Mississippi Code Annotated section 27-19-323 (Rev.2006). Additionally, Mississippi Code Annotated section 27-19-40 (Rev.2006) regulates “special in-transit tags” like the tag presently at issue, and requires that such a tag be “properly displayed” and “displayed in plain view.” Miss. Code Ann. § 27-19-40(l)(c) and (4) (Rev.2006). Deputy Sense-ney personally observed that Wade did not have a license plate that was “conspicuously displayed” on his rental car. Additionally, because Deputy Senseney could not see any license plate on Wade’s rental car, Deputy Senseney had probable cause to believe that Wade did not have a license plate. It follows that Deputy Senseney had probable cause to believe that Wade had committed a traffic violation. A law enforcement officer may stop a vehicle when there is probable cause to believe that a traffic violation has occurred.
 
 Walker v. State,
 
 962 So.2d 39, 42(¶ 6) (Miss.Ct.App.2006) (citing
 
 Whren,
 
 517 U.S. at 810, 116 S.Ct. 1769). Consequently, we cannot find that the circuit court erred when it concluded that Deputy Senseney acted within his authority when he stopped Wade.
 

 ¶ 26. Wade stopped his car, and as Deputy Senseney approached Wade, Deputy Senseney realized that Wade had a temporary Alabama license plate. However, having stopped Wade, Deputy Sense-ney also had the responsibility to ensure that Wade’s temporary license plate was valid and that Wade had liability insurance.
 
 See
 
 Miss.Code Ann. § 63-15-4(3) (Rev.2004) (stating that “[u]pon stopping a motor vehicle for any other statutory violation, a law enforcement officer, who is authorized to issue traffic citations,
 
 shall
 
 verify that the insurance card required by this section is in the motor vehicle.” (emphasis added)).
 

 II. DEPUTY SENSENEY’S RIGHT TO DETAIN WADE
 

 ¶ 27. Although Wade had a valid temporary license plate, it is not enough that one simply have a valid tag, “but also that the tag be displayed in plain view.”
 
 Gonzalez,
 
 963 So.2d. at 1144(1124). Deputy Senseney wrote a “courtesy citation” for Wade’s failure to display his temporary tag in plain view. During the stop, Deputy Senseney observed certain aspects of Wade’s behavior that aroused his suspicions. There was a heavy air freshener odor. There were air fresheners clipped to the air conditioning vents. There was a Bible in the center console and rosary beads hanging from the dashboard. There were what appeared to be military “dog tags” hanging from the rear-view mirror. Those features, alone, would not create reasonable suspicion that one might be smuggling contraband, but there were other matters that aroused Deputy Sense-ney’s suspicions, and Deputy Senseney articulated those matters during the hearing on Wade’s motion to suppress the evidence against him.
 

 ¶ 28. Deputy Senseney noted that, although Wade told him that his trip origi
 
 *506
 
 nated from Beaumont, Texas, Wade had rented his car in Harlingen, Texas. However, when Deputy Senseney later asked Wade again where he was
 
 coming from, it
 
 appeared to Deputy Senseney that Wade could not remember where he had begun his trip. Deputy Senseney also testified he was suspicious due to the fact that Beaumont, Texas is a considerable distance from Harlingen, Texas, and that Harlingen was significantly out of the path of Wade’s trip from Beaumont, Texas to North Carolina.
 
 [4]
 
 Deputy Senseney testified that Wade initially told him that he was traveling from Beaumont, Texas because he had been visiting an uncle who was terminally ill. However, Wade later told Deputy Senseney that his uncle was “fine.”
 

 ¶ 29. Deputy Senseney testified that Wade was behaving nervously during the traffic stop. Deputy Senseney also articulated Wade’s nervous behavior. According to Deputy Senseney, Wade’s hands were shaking when he gave Deputy Senseney his driver’s license and his car rental agreement. While Wade was in the front seat of Deputy Senseney’s patrol car, Wade was breathing heavier than normal and he was fidgeting with his clothing. Finally, Deputy Senseney requested a criminal background check on Wade. That background check indicated that Wade had multiple prior drug-related convictions.
 

 ¶ 30. Wade’s prior criminal history, display of religious items, display of military “dog tags,” and the presence of air fresheners may not, on their own or taken together, give rise to further detention of Wade. However, when viewed alongside Wade’s nervous behavior and inconsistent statements about his trip, it is not unreasonable to suspect that the “dog tags,” religious items, and heavy odor of air fresheners could be intended to conceal or distract from criminal behavior. Consequently, we cannot find that the circuit court erred when it determined that those circumstances, in conjunction with the inconsistencies in Wade’s responses and his articulable nervous behavior, warranted Deputy Senseney’s further investigation. Deputy Senseney clearly articulated that the heavy odor of air fresheners could be an attempt to mask the smell of narcotics. Deputy Senseney also stated that the Bible, rosary beads, and military identification tags could have been placed intentionally to send a message that the driver is a “good person” who was unlikely to be someone that might smuggle contraband items.
 

 ¶ 31. If, during a traffic stop, a law enforcement officer develops reasonable, articulable suspicion of criminal activity other than what was originally suspected, the scope of the officer’s stop expands and includes the investigation of the newly-suspected criminal activity.
 
 Tate v. State,
 
 946 So.2d 376, 382(¶ 18) (Miss.Ct.App.2006). Based on the matters discussed above, Deputy Senseney developed reasonable, articulable suspicion that Wade was engaged in smuggling narcotics. It follows that Deputy Senseney had a legal basis to detain Wade until Deputy Huguet could resolve his reasonable suspicion through the dog’s sniff test of Wade’s car. The record reflects that it took just three
 
 *507
 
 minutes for Deputy Huguet to respond ■with a dog. Deputy Huguet’s dog “alerted” and indicated that it smelled contraband. Those positive alerts created probable cause for Deputy Senseney and Deputy Huguet to search Wade’s car.
 
 McNeal v. State,
 
 617 So.2d 999, 1006 (Miss.1993). Accordingly, pursuant to our standard of review, we can find no error in the circuit court’s decision to deny Wade’s motion to suppress the evidence seized as a result of Deputy Senseney’s traffic stop.
 

 ¶ 32. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF POSSESSION OF MORE THAN ONE KILOGRAM OF MARIJUANA WITH THE INTENT TO DISTRIBUTE OR TRANSFER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TEN YEARS TO SERVE FOLLOWED BY FIVE YEARS OF SUPERVISED POST-RELEASE SUPERVISION AND FIVE YEARS OF UNSUPERVISED POST-RELEASE SUPERVISION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ„ CONCUR. IRVING, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.
 

 [2]
 

 . During the sentencing hearing, Wade’s attorney stated that Wade “had a couple of prior convictions.’’ Wade’s attorney went on to state that, in 1991, Wade had been convicted for a “drug-related charge” in North Carolina. Wade's attorney indicated that Wade had been sentenced to twelve years and that the sentence "was suspended for probation.” Wade's attorney said Wade "did in fact do about [fourteen] months of probation. He got revoked, I think, for a dirty urine at that time, and he did some time, but it was not the twelve years.” Additionally, Wade’s attorney stated that, in 1999, Wade was charged with "possession of a gun after having a felony conviction” for which Wade was sentenced to "eight to ten months of probation.” Consequently, the most likely reasoning for the circuit court judge's indication that he could not suspend any portion of Wade's sentence was the circuit court judge's interpretation of the provision in Mississippi Code Annotated section 47-7-33(1) (Rev.2004) that a circuit court may not suspend a portion of a sentence
 
 *503
 
 and place a defendant on probation if that defendant "[has] been convicted of a felony on a previous occasion in any court or courts of the United States." However, Mississippi Code Annotated section 47-7-34 (Rev.2004) addresses the circuit court's authority to suspend a sentence and place a defendant on post-release supervision. The Mississippi Supreme Court has held that section 47-7-34 "does not prohibit the imposition of post[-]release supervision upon a prior[-]convicted felon.”
 
 Johnson v. State,
 
 925 So.2d 86, 105(¶ 39) (Miss.2006).
 

 [3]
 

 . " 'Unsupervised' post-release supervision is also known as 'non-reporting' post-release supervision."
 
 Johnson,
 
 925 So.2d at 102 n. 12.
 

 [4]
 

 . During the suppression hearing, Wade's attorney introduced a printout of a map demonstrating that Harlingen, Texas is located at the extreme southern tip of Texas's border with Mexico. Beaumont, Texas is approximately 415 miles northeast of Harlingen. One could conclude that if Wade had been visiting his uncle in Beaumont, and Wade was traveling from Beaumont to his home in North Carolina, it defies logic to travel 415 miles in the opposite direction of his destination, adding a total of approximately fourteen hours to his trip, for the purposes of renting a car.