FAIR, J.,
for the Court:
¶ 1. The Mississippi Highway Patrol seized $20,800 in cash found in a traffic stop. After a hearing, the trial court ordered the funds forfeited to the State. We find that the claimants waived the issue of whether there was reasonable suspicion for the investigatory stop. We also find that the claimants failed to rebut the presumption that the funds, found “in close proximity” to marijuana and drug-distributing paraphernalia, were forfeitable. We therefore affirm the trial court’s judgment.
FACTS
¶ 2. On October 2, 2009, Highway Patrol Trooper Harris Bryan pulled over a vehicle, citing its temporary, out-of-state tag and “careless driving.” There were four males in the vehicle, three adults and a five-year-old child, the son of one of the adults. The driver, Rodrigo Godinez, had no driver’s license, and the car allegedly belonged to his girlfriend. The other adult occupants were Kevin Cruz and Frank Morado.
¶ 3. Trooper Bryan did not appear at trial because he was on active duty in the military. However, Trooper Darren Anderson joined him at the scene a short time after the stop. Anderson testified that when he arrived, a strong marijuana odor was coming from the claimants’ vehicle. It was described as smelling of both burned and unconsumed marijuana.
¶ 4. Godinez consented to a search of the vehicle. Ultimately, the troopers discovered three bundles of cash — $12,500 in the passenger console, $4,500 in a suitcase, and $3,800 on one of the passengers.[1] Each bundle was organized by denomination and wrapped with rubber bands, and each occupant claimed one of the bundles. A small amount of “shake” (meaning loose marijuana) was found in various places in the vehicle. Also found was a can of “Ozi-um” air freshener and a large roll of shrink wrap.
¶ 5. After the stop, the adult occupants were handcuffed and put into separate police vehicles. Trooper Anderson placed Morado in his vehicle. A drug dog was brought in, and it indicated the presence of drugs in the claimants’ vehicle. After about thirty minutes, Trooper Anderson returned to his patrol car and noticed a marijuana odor inside. Morado subsequently surrendered five grams of marijuana from a plastic bag he had concealed on his person (the depth of concealment was disputed). At the trial Morado claimed Anderson had told him the dog might bite him in the area where drugs *139 were secreted, insinuating that the surrender was not completely voluntary.
¶ 6. The petition was set for trial five times, with one continuance granted at the instance of the occupants and the rest by the State. The last continuance, from the fourth setting to the fifth, was because Bryan was reported to have been deployed out of the country. On the fifth and final setting, he was again on active duty, and the trial went on without him.
¶ 7. The three occupants did not deny that marijuana was found in the vehicle. Two did not deny they had smoked marijuana there some time before, but all were adamant they only ever possessed marijuana for personal use and that they were not otherwise involved in the drug trade. The three testified they had been on their way to Houston, Texas, to purchase used cars at auction. Morado (who claimed the largest bundle of cash) was in the used car business, and he was going to proxy purchase vehicles for the other two at wholesale prices. They were going to Texas because vehicles there are not corroded by road salt, as would be found in their native Chicago. In support, Morado produced invoices for six cash purchases of vehicles on various dates in 2007, 2008, and 2011.
¶8. The State’s witnesses testified, for various reasons we shall detail below, that they believed the trio had either sold a large quantity of drugs or were on the way to purchase one when they were stopped. The trial court agreed and ordered the money forfeited. The occupants appeal, raising several issues.
DISCUSSION
1. Legality of the Stop
¶ 9. In their first issue, the occupants contend the traffic stop was illegal and that all the evidence stemming from it should have been suppressed as the product of a Fourth Amendment violation.
¶ 10. We find that this issue has not been properly preserved for review on appeal. In the trial court, the claimants never moved to suppress the evidence obtained as a result of the stop, nor did they object to its admission into evidence. The closest they came was immediately before the trial in their argument against the State’s final, unsuccessful motion for a continuance. The claimants’ attorney contended the State had to show the stop was legal as part of its prima facie forfeiture case, and he implied it could not be done without the absent officer’s testimony. When the trial judge suggested the claimants needed authority to support this argument, they offered none, nor has such authority been presented on appeal. Instead, the claimants beg the question of whether the issue of suppression was properly before the trial court. We conclude it was not.
¶ 11. The claimants are correct that evidence seized in violation of their Fourth Amendment rights cannot be used in a forfeiture action. See, e.g., One 1992 Toyota 4-Runner v. State ex rel. Miss. Dept. of Wildlife Fisheries & Parks, 721 So.2d 609, 612-614 (¶¶ 15-22) (Miss.1998). However, we are aware of no authority that makes probable cause for the search or seizure an element of the State’s casein-chief, nor is there authority that permits the claimants to make this argument for the first time on appeal. Instead, the rule is that a party must make a pretrial motion to suppress evidence, or at the very least object to its admission in order to give the trial court an opportunity to rule on its admissibility. See Cowan v. Miss. Bureau of Narcotics, 2 So.3d 759, 765-66 (¶¶ 27-28) (Miss.Ct.App.2009).
*140 ¶ 12. Notwithstanding the waiver and procedural bar, we shall discuss the merits of this issue. Our analysis is complicated by the fact that the trooper making the initial stop, Harris Bryan, was not available for the trial. From the other testimony, we have two stated reasons for the stop: “careless driving,”, which is completely unsubstantiated in the record, and the temporary license plate on the vehicle.
¶ 13. The claimants contend there must have been an objective basis for probable cause a crime had been committed in order for Trooper Bryan to have legally stopped their vehicle. We do not agree: “It is elementary that probable cause is not a prerequisite to a brief investigatory stop, where the officer has reasonable suspicion based on articulable facts that criminal activity is afoot.” Neely v. State ex rel. Tate Cnty., 628 So.2d 1376, 1379 (Miss.1993). “Police officers may detain a person for a brief, investigatory stop consistent with the Fourth Amendment when the officers have reasonable suspicion, grounded in specific and articulable facts[,] that allows the officers to conclude the suspect is wanted in connection with criminal behavior.” Eaddy v. State, 63 So.3d 1209, 1213 (¶ 14) (Miss.2011) (quotations omitted). “Vehicles also may be the subject of an investigative stop.” Id. (quoting Haddox v. State, 636 So.2d 1229, 1234 (Miss.1994)).
¶ 14. Several witnesses (including one of the claimants) testified that one of the reasons Trooper Byran stopped the vehicle was its license plate, a paper temporary tag from Illinois. The record contains a photograph of the tag, which shows it as faded and partially obscured by a license plate frame. The tag has a dating system with a year (“09”) and a month (“Oct”) punched out, but the text is too small to be read from a distance. The stop occurred on October 2, 2009.
¶ 15. The temporary tag could be read as expiring on the first day of October 2009, the first day of November 2009, or some unspecified day in October 2009. It was established during the trial that it was, in actuality, still good at the time of the stop; the registration gives the expiration date as October 29, 2009. From this we can infer the punchouts indicate the tag expired sometime in October 2009. Given that the stop occurred on October 2, if Trooper Bryan had a perfect knowledge of Illinois custom, he would have known the tag had only a small chance of being expired. However, the question before us is “reasonable suspicion,” and we do not think a Mississippi State Trooper can be charged with perfect knowledge of other states’ conventions regarding temporary tags. The facts that the claimants’ tag was faded, partially covered, had an ambiguous expiration date, and had writing too small to read from the highway are sufficient to create reasonable suspicion warranting further investigation into its validity. See United States v. Sanchez, 572 F.3d 475, 478-79 (8th Cir.2009) (finding reasonable suspicion when trooper could not have read out-of-state temporary tag prior to stopping vehicle; trooper “stopped a vehicle based on imperfect information, but acted reasonably in doing so.”).
¶ 16. The claimants suggest Trooper Bryan did not make an investigatory stop but had already made up his mind the tag was invalid when he made the stop. Godinez, the driver, was the only person who testified as to what Bryan did immediately after pulling the vehicle over. According to Godinez Bryan walked over, told him the tag was invalid, and asked to see his driver’s license. However, even if it were the case that Trooper Bryan erroneously believed the tag was invalid, the law is clear that the question is *141 not what he subjectively believed, but what the facts indicated to an objectively reasonable police officer. “The principal components of a determination of reasonable suspicion or probable cause [are] the events which occurred leading up to the stop or search, and ... whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause.” Gonzales v. State, 963 So.2d 1138, 1141 (¶ 10) (Miss.2007) (quoting Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). As to whether Trooper Bryan exceeded the scope of the investigatory stop, an officer in an investigatory stop of a vehicle may ask the driver for his license and registration. See Horton v. State, 408 So.2d 1197, 1198 (Miss.1982); Wade v. State, 33 So.3d 498, 505 (¶ 26) (Miss.Ct.App.2009); see also State v. Thompson, 284 Kan. 763, 166 P.3d 1015, 1024 (2007). Godinez immediately admitted he did not have a driver’s license, so there clearly was probable cause to continue holding the vehicle after that time.
¶ 17. The issue of the legality of the stop was waived and is procedurally barred on appeal. In the alternative, it is without merit.
2. Admissibility of the Lab Report
¶ 18. The claimants next challenge the trial court’s admission, over their objection, of the lab report confirming that the substances recovered were, in fact, marijuana. They contend the evidence was improperly admitted in violation of the Confrontation Clause under Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).
¶ 19. This issue is without merit because the Confrontation Clause has no application to civil forfeiture eases. Austin v. United States, 509 U.S. 602, 608 n. 4, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (“[T]his Court’s decisions applying constitutional protections to civil forfeiture proceedings have adhered to this distinction between provisions that are limited to criminal proceedings and provisions that are not. Thus, the Court has held that the Fourth Amendment’s protection against unreasonable searches and seizures applies in forfeiture proceedings, but that the Sixth Amendment’s Confrontation Clause does not.” (citations omitted)).
3. Merits of the Forfeiture
¶ 20. The Mississippi Bureau of Narcotics filed a petition for forfeiture of the money under section 41-29-153(a)(5) of the Mississippi Code Annotated (Rev. 2009), which provides that “[a]ll money ... which [is] used, or intended for use, in violation” of the Uniform Controlled Substances Law is subject to forfeiture.
¶ 21. The Mississippi Supreme Court has adopted the following standard of review:
Forfeiture statutes are penal in nature and must be strictly construed. In a civil forfeiture case, the question is whether, given all of the evidence taken together, a rational trier of fact could have found that the funds were the product of or the instrumentalities of violations of the State’s Uniform Controlled Substances Laws. The trier of fact may act on circumstantial evidence and inferences as well as direct evidence.
Evans v. City of Aberdeen, 926 So.2d 181, 183 (¶ 5) (Miss.2006) (citations omitted).
¶ 22. As the State did not have direct proof of the money’s connection to drugs, it relied on the presumption of subsection 41-29-153(a)(7), which provides:
All monies, coin and currency found in close proximity to forfeitable controlled *142 substances, to forfeitable drug manufacturing or distributing paraphernalia, or to forfeitable records of the importation, manufacture or distribution of controlled substances are presumed to be forfeita-ble under this paragraph; the burden of proof is upon claimants of the property to rebut this presumption.
¶23. The trial court found this presumption applicable, a decision the claimants contest by contending the money was not actually found “in close proximity” to the drugs. Close proximity has not been strictly defined, but is instead understood to mean “very near.” Jones v. State ex rel. Miss. Dep’t of Pub. Safety, 607 So.2d 23, 29-30 (Miss.1991). The claimants rely on Neely v. State ex rel. Tate County, 628 So.2d 1376, 1381 (Miss.1993), where the supreme court cautioned:
Objects carried on the person are mobile and, in the context of this statute, should not ordinarily be viewed as in close proximity to anything not also on the person, unless the circumstances are such that the fact finder can reasonably infer that the object not found on the person had been on the person immediately prior to discovery, at a time when the object of forfeiture was also on the person.
¶ 24. This admonition is inapposite. The testimony was that most of the marijuana was found in a bag on Morado’s person, but the “shake” was throughout the vehicle, and the shrink wrap roll was found in the back.[2] The money was found in three bundles — one on Cruz’s person, one in a suitcase in the back seat, and one in the center console. The drug dog “hit” on the suitcase, indicating it had been in contact with drugs in the past. It is fair to say the money and the drugs/paraphernalia were dispersed throughout the vehicle. That some of the money was on Cruz’s person is not dispositive under these circumstances. We find no error in the trial court’s application of the presumption.
¶25. Turning to the question of whether the presumption was rebutted, we conclude it was not. We recognize the claimants made a strong case — their story was plausible and corroborated by some documentary evidence, and the drugs and paraphernalia that were found were largely consistent with personal use of marijuana. Each acknowledged prior arrests only for possession of marijuana, and all claimed to be only recreational users. However, the response from the State was also strong. Among the facts and inferences cited were that the claimants had no documentation as to where the cash came from and were never specific about what auction they were going to attend in Houston. Morado’s invoices for cash car purchases were all from the Chicago area and were dated years before and after the seizure. The money, although split up and claimed by different occupants, was packaged similarly, suggesting a common origin or destination. Critically, the three claimants gave a different explanation to the authorities at the time the cash was seized. Two initially claimed to be going to San Antonio for a wedding, while the third said they were on their way to Houston to meet a friend. Each of the three claimants also had tattoos that were identified as being associated with “The Saints,” a gang known for drug trafficking. Also important is that the large roll of shrink wrap was not consistent with the claimant’s theory of personal use, and the trial judge did not find Godinez’s explanation— *143 that it was used by his parents for packing flea market items — to be convincing.
¶ 26. The trial judge did not find the claimants’ testimony credible. “[W]hen the trial judge sits as the finder of fact, he has the sole authority for determining the credibility of witnesses.” Yarbrough v. Camphor, 645 So.2d 867, 869 (Miss.1994). And on appeal, “[a] circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and his findings will not be reversed on appeal where they are supported by substantial, credible, and reasonable evidence.” Brewer Constr. Co. v. David Brewer Inc., 940 So.2d 921, 925 (¶ 19) (Miss.2006).
¶ 27. It has also been suggested that Godinez and Cruz are “innocent owners” because most of the drugs were found on Morado. We find no merit to this argument because the drugs and paraphernalia were found dispersed throughout the vehicle. The evidence also suggests that the money, although divided into three bundles, had a common origin or destination in the drug trade.
¶ 28. We conclude a rational fact-finder, weighing all the evidence we have discussed, could have gone either way on whether the statutory presumption was rebutted. That being the case, this Court’s standard of review obligates us to affirm the trial court’s decision.
4. Proportionality of the Forfeiture
¶ 29. In their final issue, the claimants argue the forfeiture of $20,800 was grossly disproportionate to the small amount of marijuana that was actually found in the vehicle. This issue is procedurally barred because it was never argued in the trial court. Brown v. Thompson, 927 So.2d 738, 738 (¶ 16) (Miss.2006).
¶ 30. In the alternative, we find no merit to this issue. The'claimants contend, in a rather cursory fashion, that the forfeiture is disproportionate to the small amount of drugs that were found. However, that is not the proper comparison. The money was not subject to forfeiture because the claimants possessed marijuana; it was forfeited because it was proven to be either “used or intended for use” in violation of the Uniform Controlled Substances Law. The presence of the marijuana was only a part of the State’s proof. Through the statutory presumption and other evidence, the money was shown to either be the proceeds of a recent drug sale or to be intended for the purchase of drugs. In either case, the value of the illegal drugs involved would have been approximately equal to the value of the money. Its forfeiture is therefore not grossly disproportional to the wrongdoing.
¶ 31. This issue is procedurally barred and without merit.
¶ 32. THE JUDGMENT OF THE CIRCUIT COURT OF PANOLA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND JAMES, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.

. More cash was found in each bundle, but the authorities returned approximately $200 to each of the occupants for their return trip to Chicago after they were released.

. It is not clear where in the vehicle the other paraphernalia — rolling papers and the air freshener — were found.